STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
ROBERT J. CAMERON, DEFENDANT-APPELLANT.

Argued March 20, 1984—Decided June 19, 1985.

*Dwayne C. Vaughn* argued the cause for appellant (*Frank J. Morelli*, attorney).

*Stanley Cutler* argued the cause for respondent.

The opinion of the Court was delivered by

HANDLER, Justice.

The question posed by this appeal is whether a municipal zoning ordinance that excludes "churches and similar places of worship" from a residential use district can be applied to prohibit a minister from temporarily using his home to hold a one-hour religious service each week for his congregation. The minister claims that the ordinance does not, with sufficient clarity, forbid this religious activity, and, as applied against him, it is unconstitutionally vague. We agree.

## I.

The defendant, Robert J. Cameron, is a minister in the Reformed Episcopal Church, a denomination that includes some six or seven thousand adherents nationwide. When this litigation began, he was the spiritual leader of the Mount Carmel Reformed Episcopal Church congregation. Until the spring of 1981, this congregation met in a local school building. However, an increase in rent forced the group to relocate. The congregation decided to meet in the defendant's home until a permanent location could be found. Its services were attended by about twenty-five people and were conducted once each week for one-hour. These were the same services the congregation previously had held at the school, and included prayers, a sermon, and the taking of a collection.

The Franklin Township's zoning law designated seventeen zone classifications for land use in the municipality. Ordinance 832, § 404 (1976). The ordinance established single-family houses as the only permitted use in the R–15 zone, in which the Cameron property was located. *Id.*, § 504.1. The ordinance

also expressly allowed "churches and similar places of worship" in addition to single family homes in other residential zones. *See, e.g., id.,* §§ 501.1.c, 502.1.b, 511.1.b. Thus, it is not disputed that "churches and similar places of worship" were excluded by the ordinance from the use district that included Cameron's neighborhood.[1]

On August 11, 1981 the Township charged the defendant with violating § 504.1 of the zoning ordinance by using his home "for activities other then [sic] permitted use." This complaint arose after one of the defendant's neighbors reported that the religious service could be heard eighty feet from the defendant's home, and that cars parked on the street by those attending the service hindered the passage of traffic. The Township's chief zoning official later testified that one Sunday he heard church music. Based on this evidence the Municipal Court of Franklin Township found the defendant to be in violation of the ban against "churches and similar places of worship." The judge ordered the defendant to cease holding a "worship service" in his home, subject to a $500 fine for each future violation.

Following an appeal and a trial *de novo,* the Law Division also held that defendant had violated the ordinance by using his home as a "church." *State v. Cameron,* 184 *N.J. Super.* 66 (1982). This decision was affirmed by the Appellate Division, with Judge Antell dissenting on the grounds that the ordinance's prohibition of churches was too vague to apply. 189 *N.J.Super.* 404 (1983). Defendant then appealed as of right to this Court under Rule 2:2–1(a).

---

[1]Subsequently, in 1984, the Township Council enacted a new zoning ordinance. The law now allows "churches and similar places of worship" in the Cameron's neighborhood, provided that the building is set on a lot of sufficient size. Franklin Township, N.J., Ordinance 1182, § B402.5 (1984). This ordinance also provided a definition of the word "church," *id.,* § A500, discussed *infra* at 599.

## II.

We begin our analysis by recounting the reasons that both the Federal and State Constitutions render vague laws unenforceable. See *U.S. Const.*, Amend. V; *N.J. Const.* (1947) Art. I, par. 1. The evils of vague laws were explained in *Grayned v. City of Rockford*, 408 *U.S.* 104, 108–109, 92 *S.Ct.* 2294, 2298–99, 33 *L.Ed.*2d 222, 227–28 (1972) (footnotes omitted):

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

Thus, the constitutional ban on vague laws is intended to invalidate regulatory enactments that fail to provide adequate notice of their scope and sufficient guidance for their application. *Papachristou v. City of Jacksonville*, 405 *U.S.* 156, 162, 92 *S.Ct.* 839, 843, 31 *L.Ed.*2d 110, 115 (1972). The requirement of statutory clarity "is essentially a due process concept grounded in notions of fair play." *State v. Lashinsky*, 81 *N.J.* 1, 17 (1979); *accord State v. Lee*, 96 *N.J.* 156, 165 (1984).

To avoid the pitfall of vagueness, the terms of a zoning ordinance must enable a person of "common intelligence, in light of ordinary experience" to understand whether contemplated conduct is lawful. *Lashinsky, supra,* 81 *N.J.* at 18. The determination of vagueness must be made against the contextual background of the particular law and with a firm understanding of its purpose. As noted in *Village of Hoffman Estates v. Flipside, Hoffman Estates,* 455 *U.S.* 489, 498, 102 *S.Ct.* 1186, 1193, 71 *L.Ed.*2d 362, 371 (1982), the standard to determine the vagueness of a law is not one that can "be mechanically applied. The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depend in part on the nature of the enactment."

■ Not all statutes need attain the same level of definitional clarity under the vagueness doctrine. For example, a statute effecting "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Id.* at 498, 102 *S.Ct.* at 1193, 71 *L.Ed.*2d at 371–72. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. Penal laws, on the other hand, are subjected to sharper scrutiny and given more exacting and critical assessment under the vagueness doctrine than civil enactments. *See, e.g., Lee, supra,* 96 *N.J.* at 167; *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 119 n. 16 (1983). As pointed out in *Hoffman Estates, supra,* 455 *U.S.* at 498–99, 102 *S.Ct.* at 1193, 71 *L.Ed.*2d at 371–72, greater imprecision can be tolerated in enactments with civil rather than criminal penalties because of differences in the likelihood, as well as in the consequences, of any misunderstanding.

■ Another material consideration that can elevate the level of judicial scrutiny for vagueness is the extent to which the regulatory law impacts on constitutional interests. "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Hoffman Estates, supra,* 455 *U.S.* at 499, 102 *S.Ct.* at 1193, 71 *L.Ed.*2d at 372. In particular, the scrutiny to be accorded legislation that trenches upon first amendment liberties must be especially scrupulous. *See, e.g., Smith v. Goguen,* 415 *U.S.* 566, 573, 94 *S.Ct.* 1242, 1247, 39 *L.Ed.*2d 605, 612 (1974); *Town Tobacconist, supra,* 94 *N.J.* at 119 n. 16; *see also In re Hinds,* 90 *N.J.* 604, 618 (1982) (extra scrutiny for overbreadth in a first amendment context); *New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n,* 82 *N.J.* 57, 70 (1980) (same).

Judicial analysis of statutory vagueness also depends upon whether a law is challenged as applied, or facially. A statute that is challenged facially may be voided if it is "impermissibly vague in all its application," that is, there is no conduct that it proscribes with sufficient certainty. *Hoffman Estates, supra,* 455 *U.S.* at 495, 102 *S.Ct.* at 1192, 71 *L.Ed.* 2d at 369; *Lee, supra,* 96 *N.J.* at 167; *Town Tobacconist, supra,* 94 *N.J.* at 119. A statute so lacking in definitional certainty can be characterized as "perfectly vague." *L. Tribe, American Constitutional Law* 720 (1978). In *Coates v. City of Cincinnati,* 402 *U.S.* 611, 614, 91 *S.Ct.* 1686, 29 *L.Ed.* 2d 214, 217 (1971), for example, a law that forbade groups of three or more persons to gather on sidewalks and "annoy" passers-by was considered to have no ascertainable standard for inclusion or exclusion by which to determine if particular conduct was forbidden, and was thus wholly void for vagueness. Similarly, in *Smith v. Goguen, supra,* 415 *U.S.* at 578, 94 *S.Ct.* at 1250, 39 *L.Ed.* 2d at 614–15, a law that forbade "contemptuous treatment" of the American flag was found to so lack certainty of meaning as to be perfectly vague and unenforceable in its entirety.

A statute can be challenged "as applied" if the law does not with sufficient clarity prohibit the conduct against which it sought to be enforced. In *Palmer v. City of Euclid,* 402 *U.S.* 544, 91 *S.Ct.* 1563, 29 *L.Ed.* 2d 98 (1971), for example, an ordinance providing for punishment of "suspicious persons" was deemed to have a clear core meaning and thus was not found wholly void for vagueness; nevertheless the law was found vague as applied in the particular case. A party may test a law for vagueness as applied only with respect to his or her particular conduct; if a statute is vague as applied to that conduct, it will not be enforced even though the law might be validly imposed against others not similarly situated. *See L. Tribe, American Constitutional Law, supra,* at 721. Conversely, if a statute is not vague as applied to a particular party, it may be enforced even though it might be too vague as applied to others. *See, e.g., Lee, supra,* 96 *N.J.* at 167 (criminal

statute found facially valid because not "impermissibly vague in all its applications," also found valid as applied, notwithstanding the possibility of other circumstances in which it would be too vague to apply); *Lashinsky, supra,* 81 *N.J.* at 18 (criminal statute prohibiting "obstruction" of another person acknowledged to be potentially vague but, nevertheless, found to be sufficiently clear as applied to defendant's conduct in the particular case).

To summarize, a law that is challenged for facial vagueness is one that is assertedly impermissibly vague in all its applications. A statute that is challenged as applied, however, need not be proven vague in all conceivable contexts, but must be shown to be unclear in the context of the particular case. In either a facial or as-applied vagueness attack, the level of judicial scrutiny and degree of required clarity will depend on the purpose of the statute, the context in which the law is challenged, the conduct that is subject to its strictures, the nature of the punishment that is authorized, and, finally, the potential impact of the statute upon activities and interests that are constitutionally protected.

### III.

We now turn to examine the defendant's claim that his conviction cannot stand because the phrase "churches and similar place of worship" renders the ordinance vague as applied against him. In evaluating this claim, we are adjured to follow an analytic approach by which the level of clarity required of the language of the enactment depends on the nature of the activity that is sought to be regulated. *See Hoffman Estates, supra.*

The activity that is the target of the zoning ordinance in this case is neither commercial nor economic in character. Further, although for some purposes zoning laws may constitute civil regulation, this law, as enforced, is penal or quasi-criminal in nature. See *Town of Kearny v. Modern Transportation Co.,*

116 *N.J.Super.* 526, 530 (App.Div.1971). Finally, as stressed by Judge Antell in his dissent below, 189 *N.J.Super.* at 410, the ordinance impinges directly upon constitutionally-protected interests. The threat or actuality of enforcement could undermine the rights to free exercise of religion, free speech, free assembly, and privacy. For these reasons, constitutional due process calls for the utmost clarity concerning the scope of the ordinance's intended prohibitions. *See Hoffman Estates, supra.*

In considering the ordinance itself, we note initially that there are no apparent extrinsic factors to aid us in determining the intended meaning to be ascribed to the ordinance's critical phrase "churches and similar places of worship." Although in many situations the term "church" would raise no unusual interpretive problems, such problems are posed in this case because of the penal application of the zoning ordinance to a constitutionally-protected activity that is allegedly encompassed by the pertinent language.

Being not otherwise defined, the generic word "church" admits a variety of interpretations. *See, e.g.,* Ghent, "What Constitutes 'Church,' 'Religious Use,' or the like within Zoning Ordinance," 62 *A.L.R.*3d 197 (1975) (citing cases using definitions of church such as: a church is something more than merely a building in which the actual religious services are held; a church is a building set apart for public worship, especially Christian worship, but the conclusion does not follow that every place in which religious services are conducted is a church; a church is more than merely an edifice affording people the opportunity to worship God; the concept of what constitutes a church has changed from a place of worship alone, used once or twice a week, to a church used during the entire week, nights as well as days, for various parochial and community functions); *see also, e.g.,* the dissenting opinion, *post* at 610 (a home can be "a church when it is used as the regular site for the traditional services of an organized, recognized religious body, which services are presided over by the ordained

minister of said religion"); Law Division opinion, 184 *N.J.Super.* at 82 (a church is "a place where persons regularly assemble for worship"); Appellate Division opinion, 189 *N.J.Super.* at 405 (churches are buildings "set apart for public worship [including] the principal house of a parish"). Thus, the term "church" encompasses various possible meanings, and subtle distinctions in meaning can have critically different consequences when sought to be applied as part of a penal statute in a context that involves constitutionally-protected interests.

This legislative deficiency, however, need not result in the ordinance being considered perfectly vague, and therefore wholly void. Even though an application of the ordinance to the conduct of certain religious practices might be problematic in some situations and raise legitimate doubts as to the vagueness of the ordinance so applied, the ordinance could be validly applied in other conceivable contexts without raising genuine vagueness concerns. For example, the ordinance would certainly be understood to prohibit the use of structures erected for the conduct of certain religious functions. Indeed, in this case, no one appears to contest the proposition that, without offending vagueness standards this ordinance could be applied to prohibit the construction of a special purpose building that is architecturally designed and particularly adapted for the primary use of conducting on a regular basis formal religious services by a religious congregation. See *Board of Zoning Appeals v. Wheaton*, 118 *Ind.App.* 38, 76 *N.E.*2d 597, 601 (1948); *Combined Congregations v. Dent*, 140 *F.*2d 9, 10 (D.C.Cir.1943); 2 *The New Encyclopedia Britannica* 921 (1984). A building with those characteristics would indisputably constitute a "church."

An interpretive approach to the ordinance that includes an emphasis on structure would furnish needed clarity. Moreover, an interpretation that recognizes the relevance of architectural structure, as well as the use of property, is particularly appropriate in the context of municipal land-use regulation, which concerns itself with the use and physical characteristics of land.

*See* 8 *McQuillin, Municipal Corporations* 3d ed.) § 25.01 at 6–7; *id.,* § 25.17 at 48; 1 *P. Rohañ, Zoning and Land Use Controls* at 1–6, 7 (Bender pub. 1984). The ordinance thus could be understood to encompass a definition of the term "church" that is specific enough to avoid unfairly surprising any potential defendant and clear enough to guide its enforcement.[2]

The dissenters would be satisfied to use a less specific definition of the term church, one that is totally unrelated to the notion of a special building or structure. *See post* at 610. However, in addition to raising due process concerns of whether this activities-oriented definition provides an adequate warning, the vagueness attendant upon an interpretation that relies primarily on an assumed common understanding of religion creates a real and substantial risk of the ordinance being enforced against innocuous or protected conduct. *See Cameron, supra,* 189 *N.J.Super.* at 408 (Antell, J. dissenting). Further, any enforcement of the ordinance based on the kind of religion that is being practiced in a home would require local zoning officers to observe and evaluate the religious activities of private citizens. Such regulatory license raises the disturb-

---

[2]This avenue of interpretation is related to that involved in the judicial construction of assertedly overbroad statutes.

"The concept of overbreadth * * * [in contrast to vagueness] rests on principles of substantive due process which forbid the prohibition of certain individual freedoms. The primary issue is not reasonable notice of adequate standards, although these issues may be involved. Rather the issue is whether the language of the statute, given its normal meaning, is so broad that sanctions may apply to conduct protected by the Constitution." [*Lashinsky, supra,* 81 *N.J.* at 16, quoting *Landry v. Daley,* 280 *F.Supp.* 938, 951–52 (N.D.Ill.), app. dism., 393 *U.S.* 220, 89 *S.Ct.* 455, 21 *L.Ed.*2d 392 (1968), rev'd on other grounds, *sub. nom. Boyle v. Landry,* 401 *U.S.* 77, 91 *S.Ct.* 758, 27 *L.Ed.*2d 696 (1971) ]

An overbroad law may be salvaged through a judicial construction that serves to narrow the application of its sanctions. *See, e.g., Broadrick v. Oklahoma,* 413 *U.S.* 601, 93 *S.Ct.* 2908, 37 *L.Ed.*2d 830 (1973); *New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n,* 82 *N.J.* 57 (1980).

ing specter of governmental intrusion—" 'continuing official surveillance' of religious persons or entities." *See Marsa v. Wernik*, 86 *N.J.* 232, 243 (1981). These are reasons enough to eschew the looser definition.

The defendant quite reasonably suggests that the ordinance's drafters intended precisely a meaning for the word church that encompasses a special purpose building or structure. *See, e.g., Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood*, 699 *F.*2d 303, 307 (6th Cir.1983), *cert.* den. 464 *U.S.* 815, 104 *S.Ct.* 72, 78 *L.Ed.*2d 85 (1983) (ordinance banning church buildings from residential neighborhood expressly recognized to allow congregation to worship in the home of its members). This position is supported by the amendments to the zoning ordinance recently enacted by Franklin Township; these amendments specifically define a church as a "building or structure, or group of buildings or structures where persons regularly assemble for worship, which by design and construction are primarily intended for the conducting of organized religious services and accessory uses associated therewith." Franklin Township, N.J., Ordinance 1182, § A500. While the new ordinance is not dispositive evidence of the intent of the ordinance that is the subject of this appeal, it raises the reasonable possibility that the subject ordinance was also intended to prohibit a church-building in its most specific and literal sense. This possibility argues strongly against imputing to this ordinance any broader or less precise definition of the term church or the like. *See Kearny, supra*, 116 *N.J.Super.* at 530.

We need not determine whether the specific definition of a "church,"—one that includes a type of building, as well as religious use—should be ascribed to the ordinance. *Compare State v. Rosenfeld*, 62 *N.J.* 594, 602–03 (1973) (it is unwise for the Court to attempt a narrowing construction to save a law from overbreadth in the absence of an ascertainable legislative preference among alternative possible statutory definitions). Although this is a plausible definition of a church, the ordinance

interpreted with this as its core meaning still could not validly be applied against the defendant in this case. While the ordinance so construed might provide fair warning and adequate guidelines as to what constitutes a "church," that core definition would not encompass the defendant's home. This house is a typical single-family residence, not a building designed or specially constructed for the conduct of formal religious service; it is indistinguishable from other homes in the neighborhood. Further, the defendant's home is used only infrequently and incidentally for religious worship and does not exist for the primary purpose of practicing religion.

It is clear, therefore, that the ordinance as applied to the defendant is vulnerable on vagueness grounds. Its indefinite meanings focusing on religious activity alone fail to furnish adequate warning or sufficiently specific guidelines to assure its fair and consistent enforcement. Further, its more specific core meaning, which imports the concept of a special purpose building, does not cover an ordinary residential home. We accordingly conclude that the ordinance is impermissibly vague as applied to the defendant in this case.[3]

A conclusion that the narrow circumstances of this case preclude application of the ordinance to prohibit the religious practices conducted in the defendant's home does not, as suggested by the dissenting opinion, compel the municipality to allow in residential zones incompatible uses, such as schools, hospitals or restaurants. *See post* at 621. These uses may be

---

[3]We do not suggest that as a matter of due process the term "church" requires some further definition whenever used in a zoning ordinance. As noted, the term "church" can have a sufficiently definite core meaning to withstand a facial attack on the grounds of vagueness. In this case, the Township applied the term to a set of facts lying well outside the definitional core. Further, the standard used in this case to determine vagueness is stringent because constitutional rights are involved, rights so important that a high level of scrutiny is required to assure they are not impermissibly restricted. This test for vagueness may not be required in other zoning cases presenting different circumstances and other land uses and activities.

reasonably defined with sufficient clarity to overcome vagueness objections with or without the express or implied condition that a unique or special structure or building must be involved. We are satisfied that the level of judicial scrutiny called for in this case in applying the vagueness doctrine would exceed that entailed in determining a similar question as to such other uses. The primary reason for this difference is the comparative strength of the constitutional protection accorded religious freedom. *Supra* at 599 n. 4; *see Hoffman Estates, supra,* 455 *U.S.* at 499, 102 *S.Ct.* at 1193, 71 *L.Ed.*2d at 372.

Further, our determination in this case will not frustrate the municipality in its attempt to regulate other kinds of uses of a private home that may be genuinely incompatible with the predominant character of residential zones. A zoning regulation can serve the general welfare in residential neighborhoods by promoting family-style living, by minimizing congestion, noise, and overcrowding, by encouraging repose and solitude, and by fostering esthetics. To this end, a municipality can exercise its general police powers to deal with the problems of traffic, parking, noise, constant activity, overcrowding, and the like so that the character of the residential neighborhood is preserved. *See, e.g.,* 8 *McQuillin, supra,* § 25.24 at 63.

Such regulatory ordinances, however, must be drawn narrowly and be directed clearly against the assertedly offensive or detrimental conduct. *See State v. Baker,* 81 *N.J.* 99, 105 (1979) (local government cannot prohibit the choice of living arrangements not clearly shown to be incompatible with residential neighborhood); *Kirsch Holding Co. v. Borough of Manasquan,* 59 *N.J.* 241, 251 (1971) (municipality cannot enact an ordinance banning "group rental" of seaside properties because prohibition is not sufficiently directed to problems of noise, overcrowding, traffic, and the like). This narrow focus is especially mandated when the regulated activity involves constitutionally protected interests. *See Schad v. Mount Ephraim,* 452 *U.S.* 61, 68–69, 101 *S.Ct.* 2176, 2182–83, 68 *L.Ed.*2d 671, 680 (1981) (invalidating a ban on "live entertainment" and requiring nar-

row drafting to further a substantial governmental interest where constitutional liberties may be imperiled). Consequently, in this context a generalized or broad regulatory ban that may act only as an incidental or accidental restraint upon offensive or detrimental conduct cannot be considered a reasonable exercise of the police powers. As the Court observed in *Home Builders League v. Township of Berlin,* 81 *N.J.* 127, 139 (1979),

[a] provision which has some beneficial effect will not automatically be deemed valid and consonant with the general welfare. Attention must also be directed toward the detrimental effects that a particular provision has. * * * Where * * * a zoning provision * * * has effects contrary to the general welfare, * * * the court is required to decide whether a proper legislative goal is being achieved in a manner reasonably related to that goal.

As already described, *supra* at 597, in this case the generalized ban on "churches or similar places of worship" has the potential to prohibit perfectly harmless and beneficent activities, as well as those that could disturb and offend neighbors.

It thus appears that the zoning ordinance's exclusion of "churches or similar places of worship" from the particular residential zone is not sufficiently directed against the tangible detrimental effects of particular conduct. It cannot be sustained on these grounds alone as a necessary or reasonable exercise of the police powers. These asserted police power objectives cannot redeem the ordinance's lack of constitutionality on vagueness due process grounds. Accordingly, we conclude that under the circumstances the ordinance cannot be validly applied against the defendant.

## IV.

In sum, a broad range of possible meanings may be imputed to the phrase, "churches and similar places of worship," in the Franklin Township zoning ordinance. Many of these definitions emphasize only the character of religious activity that is undertaken. It cannot, however, be determined with sufficient certainty what kinds of religious practices were intended to be governed by the ordinance. Nevertheless, it may be reasonable

to ascribe a clear core meaning to the critical phrase used in the ordinance, one that avoids a determination that the ordinance is totally vague and void in its entirety. Such a core meaning would be more specific than one dependent solely upon the nature of the religious activity that occurs; it would involve an understanding of the term church in terms of both its architectural design and construction and its actual primary religious use. We nonetheless are satisfied that such a core meaning would not encompass a single-family house that is used for one hour, once each week as the temporary location to hold rather modest religious services of a small congregation.

We conclude that, under these circumstances, the ordinance does not give fair warning or notice to enable a person of average intelligence and experience to know what activities could turn his or her home into a church. Further, the ordinance does not foreclose unguided discretion in its application; it provides no sufficient assurance that its broad and undefined terms could be fairly, consistently, and uniformly enforced.

For these reasons, as applied to the defendant, the ordinance must be found vague and unenforceable as a matter of constitutional due process. The conviction predicated on this ordinance must be set aside. The judgment below is reversed.

CLIFFORD, Justice, concurring in result.

Ordinarily I would adhere to the time-honored maxim that half a loaf is better than none, express my approval of the result reached by the Court, and await another opportunity to unburden myself of the views that at once separate me from my colleagues in the majority and yet lead me to join in their judgment of reversal. The temptation to take that course is great, for the Court comes tantalizingly close to the right answer. It hints at it. But by avoiding coming to grips directly with the profound underlying issue—namely, whether a municipality can prevent residents from preaching, praying, singing hymns, and coming together in the name of their Lord

in a private residential dwelling—the Court fails to put to rest an important and troublesome issue, and, the worse for this defendant, perhaps encourages the municipality to pursue, as it has thus far pursued with single-minded tenacity, its misguided purpose of forbidding defendant from engaging in the activity that resulted in his conviction, today mercifully reversed by this Court. I would end this bizarre episode once and for all by declaring that constitutional considerations beyond "vagueness" foreclose *any* use of *any* of Franklin Township's powers to prohibit the foregoing activities in defendant's home between 11:00 a.m. and noon on Sundays.

I

We were told at oral argument that Robert J. Cameron is a full-time student. He lives with his family in a single-family dwelling, owned not by his church but by him, located at 305 West Point Avenue, Somerset, Franklin Township. The property is in an R–15 zone, in which the zoning ordinance permits single-family dwellings on minimum-lot sizes of 15,000 square feet, a restriction with which the Cameron residence complies. So far as the record reveals, the structure is what one might expect to find in such a residential zone: modest in size, with living-room, dining-room, bedrooms, kitchen, bath, and a small addition in the nature of a recreation room—a home in which the Cameron family did what families do: ate, slept, grew, worked, relaxed—in short, lived.

They also prayed. In addition to pursuing his education, defendant acts as minister of a formative congregation known as the Mount Carmel Reformed Episcopal Church (Mount Carmel). Mr. Cameron was graduated from the Theological Seminary of the Reformed Episcopal Church in Philadelphia, and was ordained as a Deacon in 1978 and as a Presbyter in 1980. The Reformed Episcopal Church is a Protestant denomination, having broken away from the Protestant Episcopal Church in 1873 after a generation of struggling between those influenced

by the Oxford Movement (high churchmen) and the Evangelicals (low churchmen). In the 1960's total membership of the Reformed Episcopal Church was reported at 7,085. At the end of 1980 there were 6,176 members and a total of seventy churches, generally in the areas of Illinois, Florida, New Jersey, New York, Pennsylvania, and South Carolina. At last count the clergy totalled 101.

Mount Carmel's is hardly an affluent congregation. It cannot afford to rent a location for its services, not even the $350 per month that 1000 feet of store-front space would cost. It therefore meets in the humble residence of its minister, traditionally a practice of new congregations. One should therefore erase from the mind any image of, say, the Most Reverend and Right Honorable Robert Alexander Kennedy Runcie, M.C., D.D., 102nd Archbishop of Canterbury and Primate of all England, plopping down Canterbury Cathedral in the middle of bucolic Somerset County, or of the Camerons' neighborhood being transformed into St. Peter's Square. We are talking about a few folks gathering at someone's home.

Every Sunday, from 11:00 a.m. until noon, Mr. Cameron invites into his residence those with whom he shares mankind's deepest beliefs. His purpose is to pray and sing with his invited guests, a group whose numbers have not exceeded twenty-five, and, as leader of the group, to deliver a message of inspiration. There is no amplification, no parking lot, no sign, no cross, no defacement of the neighborhood. The offensive effect of the group's conduct, as testified to at the municipal court hearing, amounted to no more than a complaint by one of Cameron's neighbors that singing could be heard from a distance of eighty feet away and that on one occasion a guest's car was parked in front of his house. The might, majesty, dominion, and power of the State of New Jersey are marshalled to combat these conditions, through enforcement of a zoning restriction against churches in a residential zone, in order to stifle the religious activities described above.

Passing strange it is that the United States Supreme Court permits possession, within the confines of the home, of obscene movies, *see Stanley v. Georgia*, 394 *U.S.* 557, 89 *S.Ct.* 1243, 22 *L.Ed.*2d 542 (1969); that this Court disallows prosecution, as violating a constitutional right of privacy, of group fornication in an automobile parked in a deserted lot, *see State v. Saunders*, 75 *N.J.* 200 (1977); that this Court overrules a regulatory agency's disciplining of a licensed tavern that permits apparent homosexuals to congregate at a bar, *see One Eleven Wines & Liquors, Inc. v. Division of Alcoholic Beverage Control*, 50 *N.J.* 329 (1967); and yet the State, in disregard of the thrust of all these decisions, resorts to Franklin Township's zoning ordinance—which bears all the earmarks of having been drafted with no thought whatsoever to the problem before us—to prohibit private religious observances within the confines of one's own home.

II

For reasons not entirely clear to me, the State and our dissenting colleagues have attempted to squeeze into the case the larger issue of whether a municipality can, through its zoning power, exclude from residential zones churches and similar places of worship. The point was not raised by defendant in the Appellate Division nor is it included in his statement of questions presented to this Court. Considered and deliberate resolution of that provocative and portentous issue calls for far more extensive briefing, far more exacting scrutiny, and far more discussion and hard thought than has been accorded it in these proceedings. The question remains an open one in this state and I would leave it that way for now, as does the majority by not even referring to it. Particularly would I avoid the dissenters' course of adopting, on this record, what is acknowledged to be the minority view on a non-issue in the case, see *post* at 613–18; Note, "Land Use and the Free Exercise Clause," 84 *Colum.L.Rev.* 1562, 1569 n. 42 (1984).

But even if one were to accept that proposition, one must recognize that the power to affect, through zoning, religious activity in a residential area surely has its limits. Like any other aspect of the police power, the zoning authority must be exercised for the general welfare of the community, *see Southern Burlington County N.A.A.C.P. v. Mt. Laurel Township,* 92 *N.J.* 158, 208 (1983) (*Mt. Laurel II*), and "must be exercised within constitutional limits." *Moore v. City of E. Cleveland,* 431 *U.S.* 494, 514, 97 *S.Ct.* 1932, 1943, 52 *L.Ed.*2d 531, 546 (1977) (Stevens, J., concurring in judgment). Moreover, courts have held that religious activity itself is in furtherance of public morals and the general welfare, *see Matter of Diocese of Rochester v. Planning Bd. of Town of Brighton,* 1 *N.Y.*2d 508, 154 *N.Y.S.*2d 849, 136 *N.E.*2d 827 (1956), and that religious institutions enjoy a highly-favored and protected status, which severely curtails the permissible extent of governmental regulation in this area. *Westchester Reform Temple v. Brown,* 22 *N.Y.*2d 488, 293 *N.Y.S.*2d 297, 239 *N.E.*2d 891 (1968). In enforcing the Franklin Township ordinance so as to forbid defendant's conduct, the State has therefore exceeded the limits of its authority.

> [Z]oning regulations, like all police power legislation, must be reasonably exercised—the regulation must not be unreasonable, arbitrary or capricious, the means selected must have a real and substantial relation to the object sought to be obtained, and the regulation or proscription must be reasonably calculated to meet the evil and not exceed the public need * * *.
>
> [*Kirsch Holding Co. v. Borough of Manasquan,* 59 *N.J.* 241, 251 (1971).]

The free-exercise clauses of the United States and New Jersey Constitutions extend to all lawful conduct founded in religious belief.[1] *See Wisconsin v. Yoder,* 406 *U.S.* 205, 220, 92 *S.Ct.* 1526, 1535, 2 *L.Ed.*2d 15, 27–28 (1972); *Thomas v. Review Bd. of the Ind. Employment Sec. Div.,* 450 *U.S.* 707, 101

---

[1]"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *." *U.S. Const.* amend. I. "No person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience * * *." *N.J. Const.* art. 1, para. 3.

*S.Ct.* 1425, 67 *L.Ed.*2d 624 (1981); *Sherbert v. Verner,* 374 *U.S.* 398, 402–03, 83 *S.Ct.* 1790, 1792–93, 10 *L.Ed.*2d 965, 969–70 (1963). Deprivation of the protections afforded thereby requires the State to demonstrate some "overriding governmental interest," *United States v. Lee,* 455 *U.S.* 252, 257, 102 *S.Ct.* 1051, 1055, 71 *L.Ed.*2d 127, 132 (1982), that justifies the "substantial infringement of appellant's First Amendment right" and to show that "no alternative forms of regulation would combat such abuses without infringing First Amendment rights." *Sherbert, supra,* 374 *U.S.* at 406–07, 83 *S.Ct.* at 1795, 10 *L.Ed.*2d at 972; *see also New Jersey Bd. of Higher Educ. v. Shelton College,* 90 *N.J.* 470, 483 (1982) (state regulation of higher education must choose least restrictive means that will accommodate free exercise of religion).

It could scarcely be clearer that the State has failed to make any such showing in this case. The complaint that hauled Cameron into court was prompted by concerns of noise and crowding (although my search of the record fails to uncover proof of the offensive nature of either)—concerns that can be addressed adequately, as the Court recognizes, by existing local ordinances dealing with parking, noise, or health. In dealing with matters of privacy and other liberties, this Court has consistently supported the right of our citizens to be secure in the home, without the disruptive arm of the State intruding into their personal affairs. *See, e.g., State v. Baker,* 81 *N.J.* 99 (1979). Nothing can be more deeply personal than Mr. Cameron's desire to worship in the manner at issue here. He is at home. He is in prayer. He is with friends. He is entitled to be left alone.

### III

For the foregoing reasons I agree with the Court's decision to vacate defendant's conviction for violating the zoning ordinance in effect at the time he was charged. Likewise do I concur in the conclusion that the recently-enacted ordinance

could not support a conviction based on the same activities as produced this brouhaha. But because of Franklin Township's determination to outlaw those activities, a word about the latest ordinance is in order.

The new ordinance became effective after the oral argument in this Court. Under that ordinance, "churches and similar places of worship" are now a conditional use in an R–15 zone, and a church is defined as a "building or structure where persons regularly assemble for worship, which by design and construction are primarily intended for the conducting of organized religious services and accessory uses associated therewith."

The passage of the latest ordinance prompted correspondence between the Court and counsel directed to the effect on this appeal of the "time of decision" rule (see *Kruvant v. Cedar Grove*, 82 *N.J.* 435 (1980)). From that correspondence the municipality's position is abundantly clear: "Although a church is now a conditional use in a R–15 Zone, whereas in the prior ordinance it was prohibited, the acreage requirement would still prohibit the use in the present case due to insufficient area * * * " (letter of July 23, 1984, from attorney for municipality); and "[i]f the * * * appropriate zoning official [had] to resolve the permissibility of the subject property's use under the new Zoning Ordinance, the official in question could only deny such use." (Letter of October 2, 1982, from attorney for municipality).

As I have sought to make clear, I do not believe there is any legitimate definition of "church" or indeed any other permissible provision of a municipal zoning ordinance or any other kind of ordinance that can furnish a basis for prohibiting the activities that took place in this defendant's home. The municipality's stated intention, however, is to persist in its effort to close the doors of the Cameron household to the protected Sunday-morning religious observances conducted there—this, despite the ordinance's definitional requirement that for a building to

be a church, it must be *"primarily* intended for the conducting of organized religious services * * * " (emphasis added), and the Cameron household was used for religious activity for only $\frac{1}{168}$ of the week. The Court therefore correctly invalidates any application of the new ordinance to this defendant's conduct, *ante* at 597, although again limiting its ruling to "vagueness" grounds. I would use the occasion to leave no doubt in the minds of the municipal officials that their misguided effort must fail and that further prosecution on any basis is entirely unwarranted, as would be any application for injunctive relief.

In the effort to vindicate his rights defendant has already appeared as *pro se* in the Municipal Court on several occasions; has undergone the expense of a trial *de novo* in the Law Division; has had to mount an appeal to the Appellate Division; and, finally, has borne the additional cost of an appeal to this Court. The municipality has signalled its intention to continue to tell defendant that he is wrong. We should not tolerate more of the same when, to me at least, defendant has been right all along. Enough, as the saying goes, is enough.

V

Recently in *Lynch v. Donnelly*, 465 *U.S.* 668, 104 *S.Ct.* 1355, 79 *L.Ed.*2d 604 (1984), the Supreme Court echoed Justice Douglas's observation that "[w]e are a religious people whose institutions presuppose a Supreme Being." *Id.* at ——, 104 *S.Ct.* at 1360, 79 *L.Ed.*2d at 611 (quoting *Zorach v. Clauson*, 343 *U.S.* 306, 313, 72 *S.Ct.* 679, 683, 96 *L.Ed.* 954, 962 (1952)). The Court reminded us of the rich diversity of our religious beliefs, and that by accommodating all forms of religious expression, "governmental action has 'follow[ed] the best of our traditions' and 'respect[ed] the religious nature of our people' " *Lynch, supra,* 465 *U.S.* at ——, 104 *S.Ct.* at 1361, 79 *L.Ed.*2d at 613 (quoting *Zorach, supra,* 343 *U.S.* at 314, 72 *S.Ct.* at 684, 96 *L.Ed.* at 962). It is worth remembering that the forefathers of many of us came to these shores to escape, among other things, govern-

ment regulation of their forms of worship. Local governments have more than enough to keep them busy in the legitimate exercise of the zoning power, delegated to them for the general welfare. *See Mt. Laurel II, supra,* 92 *N.J.* 158. That power should not be squandered in the prevention of prayer meetings conducted by invitation in the privacy of one's home.

I join in the reversal of the judgment of conviction.

GARIBALDI, Justice, dissenting.

This zoning case presents the issue of whether a minister's home, used each Sunday by his congregation for formal, liturgical services, is a "church" within the meaning of the Franklin Township Zoning Ordinance (Ordinance). I would hold that a home is a church when it is used as the regular site for the traditional services of an organized, recognized religious body, which services are presided over by the ordained minister of that body. When all these elements are present, the use is within the Ordinance's commonly-accepted meaning of "church and similar places of worship." Because all of these conditions are met here, I would hold that the Rev. Mr. Cameron's home was used as a church within the meaning of the Ordinance.

In reaching this conclusion, I find that the ordinance in question does not unconstitutionally restrict the religious freedom of the Rev. Mr. Cameron or his congregation and that the ordinance in question, with sufficient clarity, forbids the religious activity conducted by the Rev. Mr. Cameron in his home, and as applied to him, is not constitutionally vague.

I

The controversy arose when the Rev. Robert J. Cameron used his home to hold regular church services every Sunday for the congregation of Mount Carmel Reformed Episcopal Church, of which he is the minister. The Reformed Episcopal Church is a recognized religious denomination that separated from the Epis-

copal Church in 1893. The Rev. Robert J. Cameron is a graduate of the Theological Seminary of the Reformed Episcopal Church of Philadelphia, Pennsylvania. He was ordained as a Deacon in 1978 and later was ordained as a Presbyter, the highest order of ordination in his church. He is currently the minister and spiritual leader of the Mount Carmel Reformed Episcopal Church congregation and is compensated for these services.

Until sometime in the spring of 1981, the congregation held its regular formal Sunday services in a local school building. It advertised its services in local newspapers. An increase in rent led to the transfer of services to defendant's home. The congregation, despite a diligent search, could not find a permanent location that it could afford to rent. According to the Rev. Mr. Cameron, the use of temporary facilities would have caused a hardship. First, the liturgical or formal services require the use of certain religious articles that are heavy and difficult to transport and are subject to accidental damage if stored. These articles include a prayer desk (i.e., a kneeler); a lectern to hold the church bible; a pulpit from which to speak; pews or chairs for the congregation; and, if possible, a communion rail at which members may receive communion. Second, the Rev. Mr. Cameron asserts that secular surroundings detract from the solemnity of the services. According to the Rev. Mr. Cameron's affidavit, he decided to follow the traditional practice in his church, as well as in many others, of holding services for a "fledging congregation" in the home of its minister or one of its members "until a permanent 'church' location can be obtained."

For the first few weeks after moving its Sunday services to the Rev. Mr. Cameron's house, the congregation continued to advertise its services in the local newspaper. Home News, June 13, 1981, "In the Churches," at 5 ("The 11 a.m. service of Mount Carmel Reformed Episcopal Church will take place at [the Rev. Mr. Cameron's residence], in the Somerset section [of Franklin Township], with the Rev. Robert J. Cameron preach-

ing."). After the congregation discontinued this advertisement, attendance at the services was by invitation only, with invitations extended to "people that we know, we meet [sic]." No signs of any kind were placed at the Rev. Mr. Cameron's home to indicate that services were being held.

The Sunday church services held at the Rev. Mr. Cameron's house were the same services the congregation previously had held at the school. Until halted by court order, these services were conducted every Sunday from 11 a.m. to noon, first in the defendant's living room, then in a room that he recently had added to his house for, according to his building permit application of April 29, 1981, "activities of the owner," which included prayers, a sermon by the Rev. Mr. Cameron, singing, and the taking of a collection. It is clear that the home was not "used only infrequently and incidentally for religious worship," as the majority alleges. 100 *N.J.* 599. A number of people regularly attended these services. A neighbor testified that he could hear the singing and the sermon from his home eighty feet from the defendant's home, and that cars parked on the street by those attending the service hindered the passage of traffic. The Township's chief zoning code enforcer also testified that one Sunday he heard church music emanating from the Rev. Mr. Cameron's house and saw a total of fourteen cars parked in front of the house, seven in the driveway and seven on the street.

The Ordinance establishes seventeen different zones. Defendant's home is located in the R–15 residential zone, which permits only single-family dwellings. In addition to R–15, "churches and similar places of worship" are prohibited in only two other residential zones, R–10 and R–7. Of all the residential zones, these three zones have the smallest lot sizes and the densest population.

"Churches and similar places of worship" are permitted uses in all the other strictly residential zones, R–20, R–40 and RO–40–1 and in the R–R zone, R–A zone and OPT zone. In

some of these zones there are minimum lot requirements for "churches and similar places of worship." However, the OPT zone, which abuts the R–15 zone, the zone in which the defendant's home is located, permits one and two family dwellings, with no minimum lot requirement.

## II

I do not find any merit in the Rev. Mr. Cameron's allegation that the exclusion of churches and similar places of worship from a single-family residential zone constitutes an unwarranted restriction of religious worship. Mr. Cameron relies primarily on *Wisconsin v. Yoder*, 406 *U.S.* 205, 92 *S.Ct.* 1526, 32 *L.Ed.* 2d 15 (1972), and *Sherbert v. Verner*, 374 *U.S.* 398, 83 *S.Ct.* 1790, 10 *L.Ed.*2d 965 (1963), to support his position that the Ordinance unconstitutionally restricts his religious freedom. These cases are inapplicable.

In *Wisconsin v. Yoder, supra,* the United States Supreme Court held that the application to the Amish of compulsory school attendance laws violated the freedom of religion clause of the first amendment. The evidence in that case established that requiring attendance in high school would "contravene[] the basic religious tenets and practice." 406 *U.S.* at 218, 92 *S.Ct.* at 1534, 32 *L.Ed.*2d at 26. There was also expert testimony that compulsory attendance could ultimately destroy the church community. *Id.* at 212, 92 *S.Ct.* at 1531, 32 *L.Ed.*2d at 23. Neither danger is present here.

The Ordinance's exclusion of places of worship from the R–15 zone does not manifest the constitutional infirmities that caused the law in *Wisconsin v. Yoder, supra,* to fall. There is no prohibition of religious activity throughout the Township. No one is required to act contrary to his or her religious beliefs and no one is required to abandon any religious belief in order to comply with the law.

Nor is the situation in *Sherbert v. Verner, supra,* 374 *U.S.* 398, 83 *S.Ct.* 1790, 10 *L.Ed.*2d 965, similar to this case. The

United States Supreme Court in that case held that South Carolina's refusal to pay unemployment compensation to a Seventh-Day Adventist because of her refusal to work on Saturdays was unconstitutional as applied. The Court emphasized that

not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forgo that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. [*Id.* at 404, 83 *S.Ct.* at 1794, 10 *L.Ed.*2d at 970.]

Nonetheless, the Supreme Court has never implied that every law that imposes some burden on the exercise of religion is unconstitutional. Activities protected by the first amendment are subject to reasonable time, place, and manner restrictions. *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 *U.S.* 640, 647, 101 *S.Ct.* 2559, 2563, 69 *L.Ed.*2d 298, 306 (1981).

The Rev. Mr. Cameron argued that this Ordinance is not a valid restriction because it fails to meet a heightened level of scrutiny and to serve a significant governmental interest, as such restrictions must. *See id.* at 649, 101 *S.Ct.* at 2564, 69 *L.Ed.*2d at 307. The question whether an ordinance should be subjected to a stricter level of scrutiny was addressed by the Sixth Circuit Court of Appeals. In a case strikingly similar to this one, that court found no first amendment infringement of the Free Exercise Clause to exist, and thereafter found a "rational basis" on which to uphold a municipal zoning ordinance that prohibited construction of church buildings in virtually all residential districts. *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. Lakewood*, 699 *F.*2d 303 (6th Cir.), *cert.* denied, 464 *U.S.* 815, 104 *S.Ct.* 72, 78 *L.Ed.*2d 85 (1983).

The Court focused on the centrality of the burdened religious observance to the believer's faith to determine the existence of an unconstitutional infringement. It first noted that the construction of the Kingdom Hall was merely "a desireable accessory of worship, not a fundamental tenet of the Congregation's

religious beliefs." *Id.* at 307. It next noted that the ordinance resulted in making the practice of the Jehovah's Witnesses' beliefs more expensive, but did not require the Congregation to abandon its religious beliefs.

> The burdens imposed on the Congregation by the ordinance are an indirect financial burden and a subjective aesthetic burden. The Congregation may build a church in Lakewood only in commercial or multi-family residential district. Land in these districts is more expensive and, the Congregation claims, less conducive to worship than the area where the lot is located. However, this is not a case where the Congregation must choose between exercising its religious beliefs and forfeiting government benefits or incurring criminal penalties. No pressure is placed on the Congregation to abandon its beliefs and observances. While it is true that the Congregation would face penalties if it began building on the proposed site, the penalties would not have the purpose or the effect of dissuading the Congregation from practicing its faith. In short, the burdens of the ordinance are the increased cost of purchasing land and the violation of the Congregation's aesthetic senses, if the Congregation chooses to build a new church in Lakewood.
>
> [*Id.* at 307.]

Finding no infringement of religious freedom to exist, the court invoked the standard of review established in *Village of Euclid v. Ambler Realty Co.*, 272 *U.S.* 365, 47 *S.Ct.* 114, 71 *L.Ed.* 303 (1926). It determined that the ordinance did bear a "substantial relation to the public health, safety, morals or general welfare." 272 *U.S.* at 395, 47 *S.Ct.* at 121, 71 *L.Ed.* at 314. Accordingly, the Court held that the ordinance was rationally based and that Lakewood had met its minimal burden in justifying its zoning ordinance.

> The exclusion of all uses except residential substantially minimizes congestion, noise and confusion due to motor vehicle traffic. The City has legitimately and rationally exercised its police power to preserve a "quiet place where yards are wide, people few, and motor vehicles restricted." *Belle Terre*, 416 *U.S.* [1] at 9, 94 *S.Ct.* [1536] at 1541 [39 *L.Ed.*2d 797 (1974) ] [*Lakewood, supra*, 699 *F.*2d at 308.]

As in *Lakewood*, there is no infringement of religious freedom here. The exclusion of places of worship from the R–15 zone poses no threat to the continued existence of the Reformed Episcopal Church. Defendant has not demonstrated that anyone wishing to attend religious services, including the

members of the Rev. Mr. Cameron's congregation, has suffered any particular detriment.

In fact, the Rev. Mr. Cameron did not claim before the Municipal Court, or the Appellate Division, nor does he claim here, that unless the congregation could conduct religious services at his home, it will be unable to conduct religious services at any other location. Nor has the Rev. Mr. Cameron presented any facts that would support a claim that the exclusion of churches from the R–15 zone effectively terminates his congregation's right to practice its religion. Nothing in the ordinance suggests that a minister residing in any of the zones allowing churches would be prohibited from holding church services in his home; that the Rev. Mr. Cameron could not conduct services in the abutting OPT zone, either by acquiring a home or using the home or business establishment of someone located in that zone; or that it is impossible for the congregation to practice its religion in a neighboring municipality.

The fact that Rev. Mr. Cameron's congregation was unable to continue to rent premises from the Board of Education suggests that financing is a problem with any relocation. That observation, however, is very far from the proof needed to support the conclusion that there were no other practical alternatives that would not violate the Ordinance. Accordingly, there has been no showing that the Ordinance in fact infringes upon the Congregation's right to free exercise of religion.

The municipality also satisfies the second prong of the test set forth in *Lakewood*—namely, that the Ordinance bears a substantial relation to the public health, safety, morals, or general welfare. The significance of the Township's interest in regulating traffic, safety, noise, and congestion becomes clear when the Ordinance is viewed as a whole. The United States Supreme Court has acknowledged that a municipality has the power to "lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." *Belle Terre v. Boraas*, 416 *U.S.* 1, 9, 94

*S.Ct.* 1536, 1541, 39 *L.Ed.*2d 797, 804 (1974). This power becomes meaningless if uses with any first-amendment protection may not be excluded from a residential zone.

Defendant asserts that his activities are "innocuous" and no different in their effect from having a few people over for cocktails. The government, he argues, therefore has no significant interest in regulating his activity *per se.* Any deleterious effects can be regulated through enforcement of criminal statutes, general police power ordinances, and by application of the law of nuisance.

This argument misses the point for two reasons. First, it is no defense to a zoning ordinance to allege that other types of conduct would not be a violation of the zoning ordinance. That a householder, for example, may have several children who make substantial noise playing in the backyard does not mean that a nursery school could be established in such a zone. Similarly, that a small place of worship, a small restaurant, or small retail establishment may be less disruptive to the tranquility of a single-family zone than a large family is irrelevant.

Second, it is premised on the notion that the governmental interest in regulating a particular land use should be assessed on a case-by-case basis rather than as part of a whole planning scheme. This notion ignores the reason zoning became popular. Early zoning ordinances arose in part to subject certain unwanted uses to restraint without the necessity of proving the elements of public or private nuisance on a case-by-case basis. 1 *A. Rathkopf & D. Rathkopf, The Law of Zoning and Planning,* § 1.01 at 1–3, 1–11. Thus one purpose of a zoning ordinance is to relieve a municipality of the need to investigate each individual situation. This purpose is achieved by allowing a municipality to classify uses. *Id.*

Accordingly, the Ordinance does not infringe upon the Rev. Mr. Cameron's first amendment rights. Nor does the exclusion of churches from single-family zones violate the New Jersey Constitution of 1947, art. I, para. 3, 6, 18. The Ordinance, by

limiting the secular interests of the Congregation to establish a place of worship at a location of its own choosing, does not deprive anyone "of the inestimable privilege of worshiping Almighty God in a manner agreeable to the dictates of his own conscience." *Id.*, para. 3. In addition, as in *Lakewood*, the Ordinance is rationally based inasmuch as the municipality is merely invoking its police power to maintain the peace and tranquility of its residential neighborhoods.

### III

Nor do I agree with this Court's decision today that the Ordinance does not, with sufficient clarity, forbid the religious activity conducted by the Rev. Mr. Cameron in his home and, as applied to him, is vague and constitutionally unenforceable.

Although the Rev. Mr. Cameron and the majority couch their objection in terms of the unconstitutional vagueness of the statute, their basic argument is simply that the use of the home for regular religious services did not render his home a "church" within the meaning of the Ordinance. Thus, according to this argument, the Ordinance is inapplicable in this context.

The majority, in concluding that the phrase "churches and similar places of worship" is vague, analyzes the word "church" by focusing on the building or structure that is being used to signify a church or similar place of worship, rather than on the religious activity in which the participants engage. It is the activity, not the structure, towards which the Ordinance is directed. To interpret the Ordinance as narrowly as the majority suggests would leave uncovered many activities otherwise intended to be restricted.

In the absence of an explicit indication to the contrary, thee court presumes that the legislative body intended that a term, like others generally employed, be construed according to its commonly-accepted meaning. *Twin-City Bible Church v. Zoning Bd. of Appeals*, 50 *Ill.App.*3d 924, 927–28, 8 *Ill.Dec.* 919,

921–22, 365 *N.E.*2d 1381, 1383–84 (1977) (construing "church"); *Moyer v. Board of Zoning Appeals*, 233 *A.*2d 311, 316–17 (Me.1967) (construing "hotel"); *Jones v. Zoning Hearing Bd. of Lower Merion Tp.*, 7 *Pa.Cmwlth.* 284, 288–89 (1972) (construing "club"). All that is required is that the interpretation proceed in accordance with what commonly would be understood by the language employed. *See* 1 *A. Rathkopf & D. Rathkopf, The Law of Zoning & Planning, supra,* § 9.03, at 9–6 (4th ed. 1985); *Renz v. Penn Cent. Corp.*, 87 *N.J.* 437, 440 (1981) (words in statutes construed according to common meaning); *Levin v. Parsippany-Troy Hills*, 82 *N.J.* 174, 182 (1980) (same); *Abbotts Dairies, Inc. v. Armstrong*, 14 *N.J.* 319, 325 (1954) (same). The label given the use by the owner does not determine whether a proposed use comes within the terms of a zoning ordinance. This is ascertained from the *actual use* and the method of operation. 1 *A. Rathkopf & D. Rathkopf, The Law of Zoning and Planning, supra,* § 9.06, at 9–17.

New Jersey case law accords with these principles. In *George v. Board of Excise*, 73 *N.J.L.* 366 (Sup.Ct.1906), *aff'd* o.b., 74 *N.J.L.* 816 (E. & A. 1907), the court held that a building, partially used as a dwelling and storage area and partially used as a mission by "Faith Curists," was not a church. The Faith Curists, who evidently were not organized under the laws of New Jersey, held services on certain evenings and on Tuesdays (but not on Sundays) and conducted a Sunday school in the building. *Id.* at 367. The court suggested that the common meaning of "church" is a "body of persons of a common religious faith associated for purposes of worship under some form of permanent organization." There was no testimony "that any religious organization holds within the proscribed area stated meetings for church services," so the court held that a building, in which a group of merely "religiously inclined persons" met "together for Bible study and the like," was not a church. *Id.* at 368. This reasoning suggests that the activities at the location are the determining factors to establish whether a building is used as a "church."

That the nature of the user should be considered is not surprising. As long ago as 1841, Justice Nevius, in his dissent in *Trustees of the Baptist Soc'y v. Fisher*, 18 *N.J.L.* 240, 254 (Sup.Ct.), noted that the meaning of the term "church" had shifted over the years so that it involved an organizational aspect. The term "church"

> anciently signified any public meeting convened to consult upon the common welfare of a State, was afterwards used to designate the *place* of sacred or religious meetings, and again it was applied to religious congregations, assemblies or associations, but at the present time and under our institutions and laws, it must be understood to express a spiritual or religious corporation. This is now its ordinary acceptation and it must be considered as used in that sense in these articles of association.
>
> [*Id.* at 257.]

*Newark Athletic Club v. Board of Adjustment*, 7 *N.J. Misc.* 55 (Sup.Ct.1929), also focused on the actual use made of the property. In that zoning case, an applicant sought a permit to erect a public garage in a district that did not zone against such structures unless particular restrictions applied. One such restriction precluded construction of the garage within 200 feet of a church. The court was therefore required to determine whether a particular structure could be characterized as a church within the meaning of the statute. The building in question was a parish house used for conducting

> the Sunday school of Trinity Parish, at which there are prayers read, hymns sung, the reading of scripture and bible instruction, twice each Sunday except during July and August. There is choir practice every night in the week except Friday. There are church committee meetings and church social functions held there and services for deaf mutes held once a month except during Lent. In this building are also held meetings of the young people of the church, the women's auxiliary and boy scouts. Meetings of the vestry are also probably held in this building.
>
> [*Id.* at 58.]

Unlike the people using the mission in *George*, the people using Trinity Parish were an organized religious body. However, the congregation had a main place of worship, Trinity Church, which suggests that the activities at the parish house, like the activities at the Faith Curists' mission, differed from those traditionally reserved for the body's main place of worship.

These cases accord with the following dictionary definition of church in *Black's Law Dictionary*, 306 (4th ed. 1951):

> CHURCH. In its most general sense, the religious society founded and established by Jesus Christ, to receive, preserve, and propagate his doctrines and ordinances.
>
> It may also mean a body of communicants gathered into church order, *Stebbins v. Jennings*, 10 Pick. (Mass.) 193; body or community of Christians, united under one form of government by the profession of the same faith, and the observance of the same ritual and ceremonies, *McNeilly v. First Presbyterian Church in Brookline*, 243 Mass. 331, 137 N.E. 691, 694; building, *Combined Congregations of District of Columbia v. Dent*, 140 F.2d 9, 10, 78 U.S.App. D.C. 254; congregation, *Trustees of Pencader Presbyterian Church in Pencader Hundred v. Gibson*, Del., 22 A.2d 782, 787, 788; organization for religious purposes, *Williams v. Williams*, 215 N.C. 739, 3 S.E.2d 334, 338; place where persons regularly assemble for worship, *Stubbs v. Texas Liquor Control Board*, Tex.Civ.App., 166 S.W.2d 178, 180; religious society or body, *In re Werner's Will*, Sur., 181 N.Y.S. 433, 434; society of persons who profess the Christian religion, *Church of the Holy Faith v. State Tax Commission*, 39 N.M. 403, 48 P.2d 777, 784.
>
> In English ecclesiastical law. An institution established by the law of the land in reference to religion. 3 Steph. Comm. 54. The word "church" is said to mean, in strictness, not the material fabric, but the cure of souls and the right of tithes. 1 Mod. 201.
>
> A congregational church is a voluntary association of Christians united for discipline and worship, connected with, and forming a part of, some religious society, having a legal existence. *Anderson v. Brock*, 3 Me. 248.

The cited cases also accord with the standard dictionary definition that a church is a "place of worship of any religion." *See Webster's New International Dictionary* 404 (3d ed. 1971).

Zoning ordinances frequently define permitted or proscribed activity with commonly-used words such as "restaurants," "hospitals," and "hotels." As discussed above, there exists a presumption that the legislature intended that one should construe such terms according to their commonly-accepted meaning. To do otherwise and follow the reasoning of the majority, which relies upon the building or structure, would result in an anomalous result. For example, in excluding restaurants from particular zones in the municipality, the Ordinance makes no mention of dining activity as such. The generic word "restaurant" connotes a variety of interpretations. One might conceive of a restaurant as a posh eatery requiring valet parking

and formal attire or a small store-front delicatessen with a few tables and chairs. The common thread running through these images is the activity that occurs therein. To focus on the building or structure would impose an impossible task on the drafters of such statutes.

## IV

The touchstone in determining whether a statute is impermissibly vague is whether the complainant against whom enforcement is sought has been fairly warned that his conduct runs afoul of the statutory proscription. In our recent case of *State v. Lee*, 96 *N.J.* 156, 167 (1984), we held that the statute, which makes a person guilty of a fourth degree crime if that person possesses a weapon "under circumstances not manifestly appropriate for such lawful uses as it may have," was not "impermissibly vague in all its applications." In that opinion we stated: "That the prohibited behavior is not susceptible to precise definition need not lead to legislative paralysis. The words of the challenged statute are a sufficient warning so that an ordinary person 'is apprised with a reasonable degree of certainty of that which is proscribed.'" *Id.* at 166; *see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 *U.S.* 489, 498, 102 *S.Ct.* 1186, 1193, 71 *L.Ed.*2d 362, 371, reh'g denied, 456 *U.S.* 950, 102 *S.Ct.* 2023, 72 *L.Ed.*2d 476 (1982); *Town Tobacconist v. Kimmelman*, 94 *N.J.* 85, 118 (1983); Note, *The Void-For-Vagueness Doctrine in the Supreme Court*, 109 *U.Pa.L.Rev.* 67, 86 (1960) (hereinafter "Note"). Hence, the presence of knowledge or "scienter" on complainant's part has been held to be an important determinant with respect to the adequacy of notice that his conduct is proscribed. *See Flipside, supra*, 455 *U.S.* at 499, 102 *S.Ct.* at 1193, 71 *L.Ed.*2d at 372; Note, 109 *U.Pa.L.Rev.* at 87 n. 98. Therefore, while many varied meanings may be ascribed to a statutory term, "the fact that punishment is restricted to acts done with knowledge that they contravene the statute" renders untenable a claim that a statute provided claimant with no clear warning.

*American Communications Ass'n v. Douds,* 339 *U.S.* 382, 413, 70 *S.Ct.* 674, 94 *L.Ed.* 925, 951, reh'g denied, 339 *U.S.* 990, 70 *S.Ct.* 1017, 94 *L.Ed.* 1391 (1950).

Abstract words may acquire, through daily usage, a content that conveys to any interested person a sufficient concept of what is forbidden. "A term may have a meaning well enough defined to enable one engaged in the trade to apply it correctly." Annot., 96 *L.Ed.* 374, 378 (1952). And while it will always be possible for the fertile legal imagination to conjure up hypothetical cases in which the meaning of terms will be disputed, the applicable standard is "the practical criterion of fair notice to those to whom the statute is directed. The particular context is all important." *American Communications Ass'n v. Douds, supra,* 339 *U.S.* 382, 412, 70 *S.Ct.* 674, 94 *L.Ed.* 925, 951 (1950); *see also Grayned v. City of Rockford,* 408 *U.S.* 104, 111, 92 *S.Ct.* 2294, 2300, 33 *L.Ed.*2d 222, 229 (1972) (an anti-noise ordinance that proscribed "making of any noise or diversion which disturbs" not impermissibly vague since "we can never expect mathematical certainty from our language.") *Kovacs v. Cooper,* 336 *U.S.* 77, 79, 69 *S.Ct.* 448, 449, 93 *L.Ed.* 513, 518, reh'g denied, 336 *U.S.* 921, 69 *S.Ct.* 638, 93 *L.Ed.* 1083 (1949) (use of the words "loud and raucous" in Trenton ordinance restricting sound trucks did not render statute vague and unenforceable because words had through daily use acquired a content that sufficiently conveyed concept of what was forbidden).

The majority urges that this Ordinance, being quasi-criminal in nature, requires the application of heightened scrutiny. 100 *N.J.* at 594. This strict approach has been rejected by numerous cases. *In re Suspension of De Marco,* 83 *N.J.* 25, 36–37 (1980) (citing *State v. Parmigiani,* 65 *N.J.* 154 (1974), aff'g *State v. Angelo's Motor Sales,* 125 *N.J.Super.* 200 (App.Div. 1973); *State v. Gill,* 47 *N.J.* 441 (1966); *State v. Provenzano,* 34 *N.J.* 318 (1961); *State v. Gratale Bros., Inc.,* 26 *N.J.Super.* 581 (1953)). Instead, the level of scrutiny to be applied has been held to turn on the question of fairness, given the statute

and its provisions, and given the situation of defendant. Certainly, we must query whether the statute gives a person of ordinary intelligence fair notice that his conduct is forbidden and punishable by certain penalties. But, as we stated in *De Marco, supra,* 83 N.J. at 37:

That test, however, does not consist of a linguistic analysis conducted in a vacuum. It includes not simply the language of the provision itself, but related provisions as well, and especially the reality to which the provision is to be applied.

In *De Marco,* in determining whether a statute that penalizes physicians for malpractice was to be strictly construed, we considered defendant's status as a physician and whether a *"physician* of ordinary intelligence would have to understand that the legislature intended to prohibit violations of the act, intended to prohibit any act of gross malpractice that might threaten the life or health of a patient." *Id.* (emphasis added).

Therefore, one 'who may reasonably know that one's conduct falls within the proscription of the relevant ordinance may be charged with notice that the ordinance would be so construed. One may not thereafter successfully challenge the statute on vagueness grounds simply because other conduct within the ambit of the statute would not be accorded the same fair warning. *Parker v. Levy,* 417 *U.S.* 733, 756, 94 *S.Ct.* 2547, 41 *L.Ed.*2d 439, 458 (1974).

[T]he decisions of the court upholding statutes as sufficiently certain rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them * * * or a well-settled common law meaning, notwithstanding an element of degree in the definition as to which estimates might differ * * *. [*Connally v. General Constr. Co.,* 269 *U.S.* 385, 391, 46 *S.Ct.* 126, 127, 70 *L.Ed.* 322, 328 (1926).]

Applying these principles here, the ordinance is sufficiently clear so as fairly to warn the Rev. Mr. Cameron, a minister, that use of his home for regular Sunday services runs afoul of the township's exclusion of all "churches and similar places of worship" from the R–15 residential zone. As discussed *supra* at 594–595, the word "church" has acquired a common

meaning in everyday parlance that turns on the nature of the user and the actual use made of property. The meaning of "church" is well enough established so that a man of the cloth would certainly understand that the religious activities engaged in by his fledgling congregation constituted a "church," thereby providing him with the fair notice required by procedural due process.

The Rev. Mr. Cameron is an ordained minister of the Reformed Episcopal Church and the spiritual leader of the Mount Carmel Reformed Episcopal Church. The services consisting of prayers, a sermon, singing, and collections, conducted regularly every Sunday at the Rev. Mr. Cameron's home, were the same services the congregation previously conducted. The services were formal and liturgical and required certain religious equipment, including a prayer desk, a lectern for the church bible, a pulpit, a communion rail, and pews or chairs for the congregation. As defendant himself recognized in his affidavit, the services would be held in his house "until a permanent 'church' location can be obtained." And, of course, the advertisements in the newspapers, although discontinued, support the conclusion that the defendant's home constituted the church for the congregation of the Mount Carmel Reformed Episcopal Church. It is not unreasonable in my view to charge the Rev. Mr. Cameron with notice that such would be the construction of the ordinance.

Moreover, the Township provided the Rev. Mr. Cameron with notice that his activity was proscribed by the Municipal Zoning Ordinance. The Municipal Court of Franklin Township found the Rev. Mr. Cameron in violation of the Ordinance. Yet, it assessed no penalty against him and instead ordered him to cease holding services in his home subject to a $500 fine for each future violation. Such knowledge belies complainant's contention that he was deprived of due process because of a lack of notice that the activity in question was proscribed. As

such, the Rev. Mr. Cameron's challenge to the constitutionality of the statute on its face and as applied to him must fail.

## V

Subsequent to the oral argument of this case, the Court was advised that Franklin Township had adopted a new zoning ordinance that changed the standards governing the use of a property as a "church" in a R–15 zone and defined the term "church." Under *Kruvant v. Cedar Grove*, 82 *N.J.* 435 (1980), we normally would require that the legality of the use of the Rev. Mr. Cameron's home as a "church" be determined under the new zoning ordinance. Counsel for the Rev. Mr. Cameron, however, has requested that the "time of decision" rule not be applied here because, as he correctly stated, the application of the new zoning ordinance will not invalidate the Rev. Mr. Cameron's conviction in municipal court that he had violated the prior Ordinance.

Therefore, I would hold that the Rev. Mr. Cameron's home is a "church" under the prior Ordinance because it is the regular site for his congregation of Mount Carmel Reformed Episcopal Church. Moreover, I would hold that the Franklin Township's exclusion of "churches and similar places of worship" from the R–15 zone, in which the Rev. Mr. Cameron's home is located, was a legitimate exercise of the municipality's zoning power; that the exclusion violates neither first nor fourteenth amendment rights; and that the prohibition is not vague.

Accordingly, I would affirm the judgment below.

CLIFFORD and O'HERN, JJ., concurring in the result.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK and O'HERN—5.

*For affirmance*—Justices SCHREIBER and GARIBALDI—2.