NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0022-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

NATHANIEL H. RUSSELL,
a/k/a NATHAN RUSELL,

    Defendant-Appellant.

_____

<table>
<tr><td>APPROVED FOR PUBLICATION<br>April 2, 2025<br>APPELLATE DIVISION</td></tr>
</table>

Argued March 20, 2025 – Decided April 2, 2025

Before Judges Mawla, Natali, and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 23-02-0362.

Rachel E. Leslie, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Rachel E. Leslie, of counsel and on the briefs).

Linda A. Shashoua, Attorney, Special Litigation Unit, argued the cause for respondent (William E. Reynolds, Atlantic County Prosecutor, attorney; Linda A. Shashoua, of counsel and on the brief; Courtney M. Cittadini, Section Chief, on the brief).

The opinion of the court was delivered by

MAWLA, P.J.A.D.

Defendant Nathaniel H. Russell appeals from his convictions on: two counts of second-degree terroristic threats, N.J.S.A. 2C:12-3(a); fourth-degree harassment, N.J.S.A. 2C:33-4(e); fourth-degree stalking, N.J.S.A. 2C:12-10(b); and fourth-degree retaliation for past official actions of a municipal court judge, N.J.S.A. 2C:27-5. He also challenges his sentence. We affirm in part, and reverse and remand in part for the reasons expressed in this opinion.

On August 19, 2021, the victim was serving as a municipal court judge in Atlantic City and presided over a virtual proceeding involving defendant. He gave an opening statement, identified himself as the judge, explained the proceedings, assigned defendant a public defender, and adjourned the case.

On August 23, 2021, the victim received three phone messages from defendant on his law office line. Defendant identified himself as "Nate Russell." The victim recognized defendant's voice from court, describing it as "a very distinctive voice . . . [that was] very overly aggressive." He described the phone messages as "very nasty, aggressive, [and] threatening" in tone, with defendant seeming to know where he lived and worked. The victim saved the recordings, and out of concern for himself and his family, called the police.

The messages contained profane language and threats, including: "I will break your f[***]ing jaw mother f[***]er"; "play games with me p[*]ssy [and]

2

A-0022-23

get your f[***]ing neck broke"; "when I catch you in Northfield [I will] beat your a[**]"; and "I will break your f[***]ing jaw . . . p[*]ssy a[**] n[*****]." Defendant's threats included repeated vulgarity and sexually explicit language, telling the victim to "suck [his] d[*]ck," and "[g]ive me a call, p[*]ssy. I'm not f[***]ing p[l]aying no games . . . I'll come to your motherf[***]ing office in Northfield, how is that. Either way, motherf[***]er, I'm going to see you."

The following day, defendant left two additional voicemail messages on the victim's law office line. Referring to the August 19 hearing, defendant continued to threaten the victim by mentioning both Northfield and the victim's hometown, using vulgar and sexually explicit language, stating, "[y]ou better motherf[***]ing move out of [your] motherf[***]ing [hometown,]" and "I will have my foot in your motherf[***]ing a[**]."

Defendant also called the Egg Harbor Municipal Court to reach the victim. He identified himself by name, became "irate", and then yelled and cursed when the court administrator would not let him speak to the victim. Defendant also left two callback numbers, which were later confirmed as his. After receiving three such calls, the court administrator filed a judiciary incident report out of concern for the victim's safety.

The victim testified the calls were "very frightening and scary." He described defendant's references to where he lived and his Northfield office as

"extremely alarming." By the time the third message was left, he "felt scared[ and] alarmed," and "his adrenalin[e] got up there pretty high. [He] was anxious . . . . [Defendant] said he was . . . going to harm [him,]" and he "felt frightened, especially for [himself] and [his] family."

After calling the police, the victim called his wife. She was driving home with their children and other relatives in the car. The victim asked her to drive around for an hour until he could get home to meet her and the police. His wife testified she was scared and worried. When police met the victim at his home, he appeared "visibly shaken and scared." The police instituted safety precautions for two months, including having the victim change his routine to avoid encountering defendant.

After defendant was charged, the calls stopped temporarily but then resumed when the victim received approximately thirteen more calls from defendant over three days in April 2022. This time, defendant called the victim's personal cell phone, which he obtained in discovery.

When the victim answered the phone, he recognized defendant's voice and hung up. On one occasion, the victim's wife recorded the call. The victim testified he felt "harassed," "threatened," and "alarmed." He "couldn't believe [defendant] got [his] cell phone number and [that] he was calling [him] and wouldn't stop." Although he had experience with frustrated litigants, nothing

A-0022-23

like this had ever happened to him; he had never been called or physically threatened, either as a judge or when he was a municipal prosecutor.

Defendant testified he was "upset" after the August 2021 hearing because he wanted to "ask questions." He claimed he was not angry in April 2022.

A grand jury initially indicted defendant with: third-degree terroristic threats, N.J.S.A. 2C:12-3(a); fourth-degree retaliation for past official action, N.J.S.A. 2C:27-5; and fourth-degree stalking, N.J.S.A. 2C:12-10(b). In February 2023, it issued a superseding indictment, which added the charges from defendant's continuing conduct and upgraded the terroristic threat counts from third-degree to second-degree, as they occurred during a declared state of emergency, namely, the COVID-19 pandemic. Defendant was indicted with: two counts of second-degree terroristic threats during a state of emergency, N.J.S.A. 2C:12-3(a), (counts one and two); three counts of fourth-degree harassment while imprisoned or on parole/probation, N.J.S.A. 2C:33-4(e), (counts three, four, and five); fourth-degree retaliation for past official action, N.J.S.A. 2C:27-5, (count six); and fourth-degree stalking, N.J.S.A. 2C:12-10(b), (count seven).

Prior to trial, counts three and four were dismissed on the State's motion. Following a three-day trial, a jury convicted defendant on the remaining

counts. The trial judge sentenced defendant to consecutive eight-year flat terms of imprisonment on counts one and two, and concurrent one-year flat terms on counts five, six, and seven.

Defendant raises the following arguments on appeal:

POINT I

BECAUSE THE JURY WAS NOT INSTRUCTED ON THE OBJECTIVE "REASONABLE VICTIM" STANDARD, WHICH IS CONSTITUTIONALLY REQUIRED IN TERRORISTIC THREATS PROSECUTIONS UNDER STATE V. FAIR[1], . . . DEFENDANT'S TERRORISTIC THREATS CONVICTIONS MUST BE REVERSED. (Not Raised Below).

POINT II

IN THE ABSENCE OF A NEXUS BETWEEN A THREAT OF VIOLENCE AND AN EMERGENCY DECLARATION IN PLACE AT THE TIME THE THREAT IS MADE, THE SECOND-DEGREE ENHANCEMENT IN THE TERRORISTIC THREATS STATUTE BEARS NO REASONABLE RELATIONSHIP TO A LEGITIMATE STATE PURPOSE. IT THEREFORE VIOLATES SUBSTANTIVE DUE PROCESS AS APPLIED TO [DEFENDANT]. N.J. Const. Art. 1, ¶1. (Not Raised Below).

POINT III

TO PRESERVE THE APPEARANCE OF FAIRNESS AND IMPARTIALITY, THE ATLANTIC COUNTY

---

[1] 256 N.J. 213 (2024).

JUDICIARY SHOULD HAVE BEEN RECUSED FROM THIS CASE. (Not Raised Below).

POINT IV

THE COURT ERRED BY FAILING TO MERGE THE HARASSMENT CONVICTION WITH THE STALKING CONVICTION, AND THE STALKING CONVICTION WITH THE CONVICTION FOR RETALIATION FOR PAST OFFICIAL ACTION. (Not Raised Below).

POINT V

. . . DEFENDANT'S [SIXTEEN]-YEAR SENTENCE, WHICH IS SIGNIFICANTLY HARSHER THAN THE 11.5-YEAR SENTENCE REQUESTED BY THE PROSECUTOR, IS MANIFESTLY EXCESSIVE. RESENTENCING IS REQUIRED BECAUSE (1) THE SENTENCING COURT'S [STATE V.] YARBOUGH[2] ANALYSIS WAS ENTIRELY BASED ON ITS MISAPPREHENSION THAT THE VOICEMAILS WERE LEFT EIGHT MONTHS APART, RATHER THAN ON THE SAME DAY, AND (2) THE COURT ERRED BY FAILING TO FIND ANY MITIGATING FACTORS.

I.

In point I, defendant argues his terroristic threats convictions must be reversed because the jury was never instructed to assess whether a reasonable person similarly situated to the victim would have interpreted defendant's words as threatening violence and caused them to fear for their safety, as

---

[2] 100 N.J. 627 (1985).

required by Fair. 256 N.J. at 238. Instead, the jury was instructed that it must find the words or actions of defendant were of such a nature as to convey menace or fear of a crime of violence to the ordinary person, and that the State need not prove the victim was terrorized.

Defendant asserts the instruction required under Fair was necessary because the jury heard the victim encountered many frustrated or upset litigants over the five years he served as a municipal court judge, and defendant only made the phone calls because he was angry no one would answer questions about his matter. He claims this was important context that the jury was not instructed to consider because it was told to consider the statements from the perspective of an ordinary person, not a reasonable person similarly situated to the victim.

"An essential ingredient of a fair trial is that a jury receive adequate and understandable instructions." State v. McKinney, 223 N.J. 475, 495 (2015) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)). "Appropriate and proper jury instructions are essential to a fair trial." Ibid. (quoting State v. Green, 86 N.J. 281, 287 (1981)). "Jury instructions have been described as 'a road map to guide the jury[;] without an appropriate charge, a jury can take a wrong turn in its deliberations.'" Ibid. (alteration in original) (quoting State v. Martin, 119 N.J. 2, 15 (1990)). "[O]ur care in reviewing jury instructions is deep-seated

and meticulous: 'This judicial obligation, to assure the jury's impartial deliberations upon the guilt of a criminal defendant based solely upon the evidence in accordance with proper and adequate instructions, is at the core of the guarantee of a fair trial.'"  State v. Lykes, 192 N.J. 519, 537 (2007) (quoting State v. Grunow, 102 N.J. 133, 149 (1986)).

Where the defense does not object to a jury charge, we review the issue on appeal under the plain error standard.  R. 1:7-2.  The Supreme Court decided Fair after defendant's conviction and sentencing, and while this appeal was pending.  256 N.J. at 219.  Therefore, the defense could not have objected to the jury instruction because Fair was argued seven days after defendant filed his notice of appeal and decided approximately four months later.  Ibid. Regardless, because Fair announced a new constitutional rule, our review is de novo.  State v. Galicia, 210 N.J. 364, 381 (2012).

In Fair, the defendant was prosecuted for making terroristic threats against police officers after they responded to his home for a domestic violence call.  256 N.J. at 221.  While officers were present in front of the defendant's home, he began an argument with them from inside his house. Ibid.  During the argument, the defendant shouted:  "Worry about a head shot, [epithet]."  Ibid. (alteration in original).  Before clearing the scene, the officers advised the defendant they interpreted his comment as a threat.  Id. at 221-22.

Approximately two hours later, the defendant continued his tirade by posting comments on Facebook, including that he knew where the officers lived. Id. at 222. After reviewing the comments, police filed a complaint for terroristic threats against the defendant, and a grand jury subsequently charged him with violating N.J.S.A. 2C:12-3(a) and/or (b). Ibid.

The defendant moved to dismiss the indictment, arguing N.J.S.A. 2C:12-3(a) was "unconstitutionally overbroad because it criminalizes terroristic threats made with a mens rea of recklessness." Id. at 223. The trial court denied the motion, and at the defendant's trial the court charged the jury under the model charge, which in relevant part stated:

> A person acts recklessly with respect to the result of [their] conduct if [they] consciously disregard[] a substantial and unjustifiable risk that the result will occur from [their] conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to the actor, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.
>
> [Ibid. (emphasis added).]

Relevant to the issues here, the Supreme Court held "that an objective component is necessary for a prosecution for a threat of violence under N.J.S.A. 2C:12-3(a) to survive First Amendment and Article I, Paragraph 6 scrutiny." Id. at 237. Thus, "the objective inquiry, in which the jury

determines whether a reasonable person would have viewed the defendant's words as threatening violence, must be undertaken not from the perspective of an anonymous ordinary person, but from the perspective of a reasonable person similarly situated to the victim." Id. at 238 (emphasis omitted). The Court stated, "the objective element of a true threats prosecution must consider 'whether it was objectively reasonable for the victim to fear for their safety' in the context of their experiences with the perpetrator." Ibid. (emphasis omitted) (quoting Brewington v. State, 7 N.E.3d 946, 969 (Ind. 2014)).

The applicable standard in Fair was not an ordinary person, but whether a reasonable police officer, in the shoes of the police officer that Fair threatened, "would have feared for their safety, given the entire interaction with defendant." Id. at 239. Indeed,

> context matters. Considering the perspective of one similarly situated to the victim, which entails consideration of prior interactions between the parties, protects against convictions for statements made in jest, political dissent, or angry hyperbole, while allowing the State to prosecute true threats of violence that would instill fear of injury in a reasonable person in the victim's position.
>
> [Id. at 238.]

Here, defense counsel, perhaps presciently, seemingly argued the Fair standard to the jury in summations, when he stated:

This case is about an overreaction. An overreaction by the police. An overreaction by [the victim]. An overreaction by the State. And an overreaction by [defendant]. An overreaction to some phone calls that could cost my client years of his life. In reality, this case is about a few phone calls. A few voicemails. A few minutes in time that can determine my client's life.

And the State and I, we can agree on a few things. We can agree on this—[the victim] was just doing his job. You heard that from the State in opening. And that's why these allegations are even more absurd because of someone who has been working as an attorney for two decades and a judge for half a decade.

He's not new to disgruntled people. To disgruntled members of the public. To upset members of the public. This is par de course, business as usual. We have metal detectors and armed guards in most courthouses and that's because people don't enjoy coming to court. People are disgruntled. People are upset. There's an expectation that people will be upset at a verdict. Upset at a ruling. Frustrated with proceedings, with the idea of coming to court in general. And that's all [defendant] was—frustrated and blowing off steam. Just as many parties that appeared before [the victim] when he was just doing his job.

Although the defense articulated the proper standard, as is the norm, the jury was instructed counsel's comments were not evidence for its consideration. The jury instruction did not contain the standard argued by counsel because the judge was appropriately following the then-existing model jury charge for terroristic threats, which read as follows:

12

The second element the State must prove beyond a reasonable doubt is that the threat was made with the purpose to terrorize another. In this case, the State alleges . . . defendant intended to terrorize [the victim]. The State need not prove that the victim actually was terrorized. A person acts purposely with respect to the nature of his conduct, or result thereof, if it's his conscious object to engage in the conduct of that nature or to cause such a result.

The facts here present the same difficulty as the Court encountered in Fair. There is no doubt in our minds defendant acted purposely to terrorize the victim. There is no doubt the victim testified about the effects defendant's statements had on him. However, the jury was not provided with the appropriate standard to measure whether those threats met the constitutional bar of constituting criminal conduct. The jury was not instructed to consider whether a reasonable municipal court judge in the victim's position with his sort of legal experience—which included approximately five years as a municipal court judge, seven years as a municipal prosecutor, and approximately twenty years in private practice, all positions requiring him to interact with the public—would fear for their safety, having interacted with defendant.

The Fair decision constituted a new rule of constitutional dimensions. The question for us is how to apply it. Our Supreme Court has stated we have four options, including pipeline retroactivity, which means rendering the rule

13

"applicable in all future cases, the case in which the rule is announced, and any cases still on direct appeal."   State v. G.E.P., 243 N.J. 362, 386 (2020) (quoting State v. Knight, 145 N.J. 233, 249 (1996)).   We consider "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice."   State v. Henderson, 208 N.J. 208, 300 (2011) (quoting Knight, 145 N.J. at 251).

Fair announced a new rule because it interpreted the constitutionality of a statute affecting a criminal prosecution and a defendant's right to a fair trial. In this respect, Fair impels pipeline retroactivity because doing so would satisfy the first and second prongs of Knight.   Indeed, applying Fair to cases under appeal would ensure the ability to timely review and correct a criminal conviction before it is final, and it also ensures the administration of justice by preventing wrongful convictions from being upheld while also allowing the State the ability to prosecute these cases under the proper legal rubric.

We hold Fair has pipeline retroactivity because doing so benefits the defense, the State, and our justice system.  This outweighs the State's reliance in this and other prosecutions on the old rule.  We are not under the impression that there are many cases in the proverbial pipeline to begin with.  Regardless,

14

they would benefit from the applicability of <u>Fair</u>.  For these reasons, we reverse defendant's terroristic threats convictions in counts one and two, and remand for further proceedings consistent with this opinion.

## II.

The terroristic threats statute enhances the offense from a third- to a second-degree offense when the violation "occurs during a declared period of national, State or county emergency."  N.J.S.A. 2C:12-3(a).  The statute states: "The actor shall be strictly liable upon proof that the crime occurred, in fact, during a declared period of national, State or county emergency."  <u>Ibid.</u>

Defendant asserts his due process rights were violated because the second-degree enhancement as applied to him had no reasonable relationship to a legitimate State purpose.  The State charged defendant with making the threats during the COVID-19 pandemic, pursuant to which Governor Philip D. Murphy had declared a state of emergency.  However, defendant argues there was no nexus between his threats and the pandemic-related state of emergency because his threats neither referenced the pandemic, nor exploited the conditions of the state of emergency.  Although defendant did not raise this argument before the trial judge, because it is both a question of law and a constitutional argument, our review is de novo.  <u>Galicia</u>, 210 N.J. at 381.

A-0022-23

"[A] state statute does not violate substantive due process if the statute reasonably relates to a legitimate legislative purpose and is not arbitrary or discriminatory.  . . . [I]f a statute is supported by a conceivable rational basis, it will withstand a substantive due process attack."  Greenberg v. Kimmelman, 99 N.J. 552, 563 (1985) (internal citations omitted).  When there is a constitutional challenge to a statute on substantive due process grounds, we weigh the following factors:  "(1) the nature of the right asserted; (2) the extent to which the statute intrudes upon that right; and (3) the public need for the intrusion."  State v. O'Hagen, 189 N.J. 140, 164 (2007) (citing Sojourner A. v. N.J. Dep't of Hum. Servs., 177 N.J. 318, 333 (2003)).

Constitutional due process requires that criminal statutes give people "fair notice and adequate warning of the law's reach."  Town Tobacconist v. Kimmelman, 94 N.J. 85, 125 n.21 (1983).  Put another way, criminal statutes "must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that [they] may act accordingly.'"  State v. Lisa, 391 N.J. Super. 556, 578 (App. Div. 2007) (quoting State v. Clarksburg Inn, 375 N.J. Super. 624, 633 (App. Div. 2005)).

A statute is presumed to be valid.  State v. Lenihan, 219 N.J. 251, 266 (2014).  The Supreme Court has explained that "any act of the Legislature will not be ruled void unless its repugnancy to the Constitution is clear beyond a

16

reasonable doubt." Ibid. (quoting State v. Muhammad, 145 N.J. 23, 41 (1996)). "The Legislature has considerable latitude in addressing criminal conduct. It can either prepare a detailed catalogue of proscribed activities or, within constitutional limits, address the problem more generally." State v. Lee, 96 N.J. 156, 166 (1984). Our review necessarily involves significant deference to legislative judgement regarding both the propriety of the governmental involvement in the area covered by the legislation, and the reasonableness of the means chosen to achieve the legislative goals. See, e.g., Orange Taxpayers Council, Inc. v. City of Orange, 83 N.J. 246, 356 (1980) (deferring to the judgement of the Legislature in review of a substantive due process challenge).

The New Jersey Anti-Terrorism Act, N.J.S.A. 2C:38-1 to -5, "was signed into law less than a year after the September 11, 2001 terrorist attacks, to remedy shortcomings in the law at that time and better protect citizens of New Jersey." State v. Dalal, 467 N.J. Super. 261, 290 (App. Div. 2021). The Act amended the terroristic threats statute to upgrade such offenses to a second-degree offense when they occur during a state of emergency. L. 2002, c. 26, § 11.

A statute can be vague as applied if the law does not with "sufficient clarity" prohibit "the conduct against which it is sought to be enforced."

17

Lenihan, 219 N.J. at 267 (quoting Visiting Homemaker Serv. of Hudson Cnty. v. Bd. of Chosen Freeholders of Cnty. of Hudson, 380 N.J. Super. 596, 612 (App. Div. 2005)). "[I]f a statute is vague as applied to [the] conduct [at issue], it will not be enforced even though the law might be validly imposed against others not similarly situated." Ibid. (alterations in original) (quoting State v. Cameron, 100 N.J. 586, 593 (1985)). "Penal laws 'are subjected to sharper scrutiny and given more exacting and critical assessment under the vagueness doctrine than civil enactments.'" Ibid. (quoting Cameron, 100 N.J. at 591).

> A statute that is challenged as applied, however, need not be proven vague in all conceivable contexts, but must be shown to be unclear in the context of the particular case. . . . [T]he level of judicial scrutiny and degree of required clarity will depend on the purpose of the statute, the context in which the law is challenged, the conduct that is subject to its strictures, the nature of the punishment that is authorized, and, finally, the potential impact of the statute upon activities and interests that are constitutionally protected.
>
> [Cameron, 100 N.J. at 594.]

Pursuant to these principles, defendant's convictions under N.J.S.A. 2C:12-3(a) cannot stand as second-degree convictions because there was no nexus between his alleged terroristic threats and the COVID-19 state of emergency. The threats defendant directed at the victim did not result from or

have anything to do with the pandemic or pandemic-related restrictions, and his underlying municipal court case. We can easily envision a scenario where the State prosecutes a defendant for making terroristic threats against someone like the victim here by threatening to spread the COVID-19 virus by biting, spitting, coughing, or otherwise deliberately spreading the virus in some form either purposely or in reckless disregard of the risk of causing such terror or inconvenience. That did not occur here. Instead, defendant was prosecuted for making threats during a state of emergency, which had nothing to do with the legislative purpose of the degree-of-offense enhancement enacted by the Anti-Terrorism Act.

Going forward, we hold that when the State seeks to prosecute a defendant under N.J.S.A. 2C:12-3(a) for making terroristic threats during a declared period of national, State, or county emergency, there must be some rational relationship between the terroristic threats and the underlying emergency. Otherwise, the conviction will be vulnerable to an as-applied challenge for vagueness on substantive due process grounds.

### III.

In point IV, defendant argues his fourth-degree harassment, stalking, and retaliation for past official action convictions should have been merged into a single count. He claims the State's case for stalking encompassed the conduct,

<span style="float:right">A-0022-23</span>

which established harassment, including his calls to the victim in April 2022. Because stalking consisted of repeated harassment, it encompassed the elements of the harassment conviction and both offenses should have merged. He contends the stalking conviction should have merged with the retaliation because the statute punishes conduct that "harms another by any unlawful act with purpose to retaliate for or on account of the service of another as a public servant." N.J.S.A. 2C:27-5. In defendant's case, the "any unlawful act" referred to the events from August 2021 through April 2022, which constituted stalking and therefore should have merged.

Defendant did not raise these arguments before the trial judge. We nevertheless address the arguments because "merger implicates a defendant's substantive constitutional rights." State v. Cole, 120 N.J. 321, 326 (1990) (citing State v. Miller, 108 N.J. 112, 116 (1987)). It seeks to avoid multiple punishment for the same offense. State v. Miller, 108 N.J. at 116.

We have defined "same conduct" for merger purposes as meaning "identical conduct," recognizing that a defendant should not be rewarded just by virtue of proximity in time or place of the crimes. State v. Fraction, 206 N.J. Super. 532, 536-39 (App. Div. 1985). However, "the Legislature may fractionalize a single criminal episode into separate offenses when the Legislature intends them to be punished separately and when the

20

fractionalization does not offend constitutional principles." State v. Miller, 237 N.J. 15, 33 (2019) (quoting State v. Mirault, 92 N.J. 492, 504 (1983)).

Our jurisprudence has long-recognized a "flexible approach" to merger. Id. at 32 (quoting State v. Brown, 138 N.J. 481, 561 (1994)). Under this approach, courts analyze the evidence

> in terms of, among other things, the time and place of each purported violation; whether the proof submitted as to one count of the indictment would be a necessary ingredient to a conviction under another count; whether one act was an integral part of a larger scheme or episode; the intent of the accused; and the consequences of the criminal standards transgressed.
>
> [Id. at 33 (quoting State v. Davis, 68 N.J. 69, 81 (1975)).]

Merger was not appropriate here. The stalking, harassment, and retaliation crimes were independent of each other. The trial judge correctly found "these are separate criminal events. The threats were independent . . . events which occurred at separate times, some eight months apart, after defendant had been arrested and detained on the charges." The stalking charge pertained to the victim's trauma from the first event in August of 2021 through the second event in April of 2022. The harassment charge specifically pertained to the April 2022 calls to the victim's cell phone. The retaliation charge for past official action had different elements than the stalking charge; in addition to an "unlawful act," i.e. stalking, it requires the "purpose to

21

retaliate for or on account of the service of another as a public servant." N.J.S.A. 2C:27-5. Therefore, neither the harassment nor the retaliation charges should have been merged with the stalking charge.

IV.

We reject the argument raised by defendant in point III, which asserts the entire Atlantic County judiciary should have been recused sua sponte, on account of the victim's status as a municipal court judge. This claim was not raised before the trial judge and our court rules require recusal motions to be put to the trial court in the first instance "stating the reasons therefor." R. 1:12-2.

Other than the fact the victim was a municipal court judge in Atlantic County, there are no facts supporting the recusal of the county's entire judiciary. The victim's service as a municipal court judge is simply not enough to warrant recusal. Defendant received a fair trial. Following defendant's logic would weave an untangle-able web of intra-state transfers of cases based upon supposition alone. This argument lacks merit. R. 2:11-3(e)(2).

Finally, in point V, defendant challenges the length and consecutive nature of his sentence. We need not reach these arguments given our reversal of the terroristic threats convictions and remand for further proceedings.

Affirmed in part, and reversed and remanded in part for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division