# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0973-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JULIAN B. HART,
a/k/a EDWIN GOMEZ,

     Defendant-Appellant.

_____

Argued February 5, 2026 – Decided February 19, 2026

Before Judges Mawla, Bishop-Thompson, and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 21-10-1324.

Rachel E. Leslie, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Rachel E. Leslie, of counsel and on the briefs).

Monica do Outeiro, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Monica do Outeiro, of counsel and on the brief).

PER CURIAM

Defendant Julian B. Hart appeals from his convictions on: first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (count one); second-degree sexual assault, N.J.S.A. 2C:14-2(b) (count two); third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (count three); and third-degree endangering the welfare of a child (possession of child pornography), N.J.S.A. 2C:24-4(b)(5)(b)(iii) (count five).[1] He also challenges his sentence. We affirm his convictions and remand his sentence for the reasons expressed in this opinion.

Defendant is the adult son of victim K.O.'s mother's long-term live-in boyfriend. On July 7, 2021, then fourteen-year-old K.O. and her aunt B.P. went to the Asbury Park police station to report defendant had sexually abused K.O. when she was between six and eight years old. The pair spoke with Asbury Police Detective James Crawford and Monmouth County Prosecutor's Office Detective Joseph Pahopin.

K.O. lived with B.P. between the ages of four and six, then with her mother from ages six to eight, and by the time of the initial police report, B.P.

_____

[1] The jury acquitted defendant of manufacturing child pornography, N.J.S.A. 2C:24-4(b)(3) (count four).

2                                                                    A-0973-23

had custody of K.O. for approximately five years. Prior to the disclosure of K.O.'s abuse allegations, her mother had made some attempts to regain custody of her.

On July 15, 2021, K.O. gave a second report to police, further detailing her allegations against defendant. On August 12, 2021, defendant was questioned at the police station about K.O.'s allegations in a recorded interview with Detectives Crawford and Pahopin. He was arrested following the interview and later indicted.

Prior to trial, the State moved to admit defendant's recorded statement. The trial judge conducted a hearing at which Detective Crawford testified, and the State played the recorded interview. Following the detective's testimony, the defense agreed defendant's statement was knowing, voluntary, and admissible subject to certain agreed-upon redactions.

K.O. was fifteen years old and still residing with B.P. when she testified at trial. From ages six to eight years old, she went "back and forth" between her grandmother's home and her mother's apartment in Asbury Park, where her younger sister and mother's boyfriend resided as well.

K.O. testified defendant's relationship with her was "like he was [her] brother." When he came to visit, he would take her out sometimes, and on those

A-0973-23

trips, he would abuse her. For example, defendant took her to the store where she picked out snacks, including peach rings. After returning to her mother's apartment, defendant made her "take the[ peach rings] out of his mouth with [her] mouth."

K.O. testified defendant drove her and her younger sister around in a silver Honda with tinted windows. He drove them to a church parking lot where he pulled down K.O.'s pants, "made [her] suck his thumb, and . . . put his mouth on [her] vagina," while her sister sat in the backseat. The abuse in the church parking lot occurred on at least "two or three" other occasions.

Defendant also abused K.O. in his apartment. She described the appearance of the apartment to police in detail. On one occasion, defendant drove K.O. and her sister to his apartment to watch a movie, and while watching the movie, he "put his fingers in [K.O.'s] vagina," which made her feel "scared." He kept going despite her telling him to stop. She stated defendant took her to his apartment and digitally penetrated her around five more times. K.O. remembered she was around eight years old at the time because she had just celebrated a birthday.

A-0973-23

K.O. testified defendant showed her photos of his penis on his phone and in some of those photos she could see his face. She stated the photos were locked in a folder on his iPhone, which required a passcode for access.

K.O. explained she did not tell anyone about the abuse until 2021. The issue arose when K.O.'s uncle discovered a writing in her notebook alluding to her abuse. Her uncle informed another uncle, who then called K.O. and confronted her about it. She told the uncle what happened. B.P. overheard K.O.'s conversation with the uncle, so she took K.O. for a walk and K.O. "had to tell her what happened." K.O. "didn't want to tell [B.P.]" about the abuse because she did not want to be viewed as a victim. She never said anything at the time of the abuse because she feared defendant since he was a man. She "didn't have . . . the choice to tell" B.P. since it "came out already" when B.P. overheard her conversation with the uncle.

The State called B.P. to testify about K.O.'s disclosure of abuse. She learned about K.O.'s allegations in the summer of 2021 after she overheard K.O. tell her uncle she had been "inappropriately touched." When B.P. confronted K.O. about the conversation with her uncle, K.O. cried and said defendant had sexually abused her when she lived with her mom. B.P. testified she took K.O. to the police station to file a report against defendant.

5

The defense did not object to B.P.'s testimony. The trial judge gave the jury the following limiting instruction about fresh complaint evidence:

> It does not strengthen [K.O.'s] credibility. It does not provide the underlying truth of the sexual offense. A fresh complaint only dispels any negative inference that might be made from her assumed silence. . . . If there was a delay in making the complaint you may consider whether any circumstances existed which would explain the delay. . . . [T]his testimony was permitted for . . . a limited purpose. The making of a complaint is not an element of the offense. Proof that a complaint was made is neither proof that the sexual offense occurred, nor proof that [K.O.] was truthful. It merely dispels any negative inference that . . . might arise from her assumed silence[ or] . . . that her claims of having been sexually assaulted are false because of her assumed failure to have confided in . . . anyone about the sexual offense.

The State also called Detective Crawford, who testified about the corroborating evidence he found in his investigation. He explained a check of the Motor Vehicle Commission database revealed defendant "owned a gray Honda Civic" around the time the alleged abuse occurred. The detective used K.O.'s descriptions of the locations of the alleged abuse, including the church parking lot and defendant's old apartment, and was able to identify those locations on a map, which K.O. then verified as correct. The detective confirmed which apartment unit belonged to defendant using a law enforcement database and photographed its interior to compare it to K.O.'s description.

6

Detective Crawford discussed evidence found on defendant's iPhone, including a "[p]hoto vault . . . application . . . use[d] to lock file folders of images." The photo vault contained folders associated with defendant, his then-wife, his ex-girlfriend, and one folder titled, "!!!!!". The folder associated with defendant contained photos of his genitalia; the folders associated with his then-wife and ex-girlfriend contained sexual photos of them; and the "!!!!!" folder contained numerous photos of K.O. The password to the "!!!!!" folder was K.O.'s name.

The State submitted a photo of K.O. found in the "!!!!!" folder on defendant's iPhone. The photo was captured by an iPod Touch on K.O.'s eighth birthday and depicts her holding a balloon, with her shirt lying just below her uncovered breasts. Both K.O. and defendant testified he had given her an iPod Touch around that time. K.O. could not recall who took the photo of her. The photo became the subject of the manufacture of child pornography and possession of child pornography charges.

Another State's witness, Detective Daniel Chernavsky, also testified about the photo vault evidence. His role in the investigation was to extract the files at issue from defendant's iPhone. He discussed the extraction process and how he used the extracted information to build a report. The detective testified a device

7

would not automatically connect to iCloud, rather the user would need to have access to "pertinent information, . . . identifiers, passwords, account names[,] and things like that" to manually connect the device.

During cross-examination, defendant confirmed his iPhone had the photo vault application on it and access to the folders was password protected. Defendant also testified there was a folder for himself containing pictures of him and his genitalia. In another folder, there were nude photos of him and his then-wife engaged in sexual acts. At that point, defense counsel objected based on relevance, arguing the photos of defendant, and those of him with his former wife, were unrelated to the charges. The State responded its line of questioning was directed toward the ultimate issue, namely, the pornographic images of K.O. The trial judge overruled the objection and instructed the State to "[j]ust tie it up."

Without objection, the State played the recording of defendant's interview with detectives for the jury with the agreed-upon redactions. On the video, defendant explained: he considered K.O. to be his sister; he was never alone with her; and she had been to his apartment only "once or twice" with other family present. The jury also saw detectives confront defendant with the fact K.O. had given them a detailed statement, showing she knew the inside of

8

defendant's apartment very well and had been there several times. The video also showed defendant confirming he drove a Honda Civic as described by K.O.

Defendant's testimony at trial mirrored his statement to police. He repeatedly denied the allegations against him, asserting he never had sexual contact with K.O. or took sexual pictures of her. The photo of K.O. on his phone was shared by K.O.'s device through iCloud, through no action of his own. However, defendant admitted he did not delete it.

Defendant claimed the allegations against him were really driven by a "custody issue between [K.O.'s] mother and her current guardian," B.P. His father testified about the custody dispute over K.O. and claimed B.P. wrongfully took K.O. from them. K.O.'s mother also testified about the custody dispute with B.P.

The trial judge conducted the sentencing following defendant's conviction. The judge noted defendant was thirty-nine years of age and employed prior to his arrest. The judge further stated:

> [S]ignificantly[, defendant had] five prior [S]uperior [C]ourt convictions between 2009 and 2014, and the most serious one being the first one in 2009, endangering the welfare of a child [in the] third degree, where he received jail time, then parole supervision for life[ (PSL)], [and] Megan's Law registration, which he continues to be on.

A-0973-23

He attended a recovery program in 2017 as part of PSL. Defendant's other convictions included three separate convictions in 2010 for: fourth-degree failure to register; criminal mischief; and possession of a controlled dangerous substance—each of which he received jail or prison time for. In 2014, defendant was convicted of criminal trespass and subsequently imprisoned.

The 2009 conviction concerned the judge as it involved two young girls, and the offense here involved K.O., who was between six and eight years old. K.O. testified credibly the incidents involving her went on for years. Defendant's photo of K.O. at a young age with her top down disturbed the judge.

The judge found aggravating factor two, N.J.S.A. 2C:44-1(a)(2), noting "the gravity and seriousness of the harm inflicted on the victim . . . was described during the trial." K.O. "was particularly vulnerable due to her extreme youth between six and eight years of age," and because she was like "a little sister" to defendant. He found aggravating factor three, N.J.S.A. 2C:44-1(a)(3), the risk defendant would reoffend was "clear based on the fact that between 2009 and . . . this offense[,] he has committed a number of crimes . . . since he's been on [PSL]." Aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), applied because "there is clearly the need for deterring . . . defendant and others from violating the law, sexual predators as to . . . young children[,] that is . . . what the Jessica Lunsford

A-0973-23

Act, [N.J.S.A. 2C:14-2,] . . . is all about. . . . [T]o try to stop sexual assaults upon children under the age of [thirteen] years." The judge concluded the aggravating factors substantially outweighed the lack of mitigating factors.

The trial judge merged counts two and three with count one, and sentenced defendant to a forty-year custodial term in accordance with N.J.S.A. 2C:14-2, subject to an eighty-five percent parole disqualifier pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant received a concurrent custodial term of five years on count five. The judge ordered defendant to pay fines and penalties, including a thirty dollar per month penalty paid to the Sexual Offender Supervision Fund, N.J.S.A. 30:4-123.97.

## I.

Defendant raises the following arguments on appeal:

> POINT I. TESTIMONY ABOUT K.O.'S DISCLOSURE OF SEXUAL ABUSE TO B.P. AND TO DETECTIVES SIX YEARS AFTER THE FACT DID NOT QUALIFY FOR THE FRESH COMPLAINT EXCEPTION AND WAS THEREFORE INADMISSIBLE HEARSAY. ITS IMPROPER ADMISSION DENIED [DEFENDANT] A FAIR TRIAL. (Not raised below).

> POINT II. THE CHILD PORNOGRAPHY PROVISION UNDER WHICH [DEFENDANT] WAS CONVICTED IS UNCONSTITUTIONALLY VAGUE

11

A-0973-23

AND OVERBROAD UNDER STATE V. HIGGINBOTHAM.[2]  (Not raised below).

POINT III. [DEFENDANT] WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL BY THE ADMISSION OF PORTIONS OF THE VIDEOTAPED STATEMENT IN WHICH DETECTIVE PAHOPIN REPEATED K.O.'S GRAPHIC ALLEGATIONS AND EXPRESSED HIS PERSONAL BELIEF THAT K.O. WAS CREDIBLE.  (Not raised below).

POINT IV. THE IMPROPER INTRODUCTION OF [DEFENDANT]'S INTIMATE PHOTOS, INCLUDING PHOTOS OF HIM ENGAGED IN SEXUAL ACTIVITY WITH HIS ADULT WIFE, DENIED HIM A FAIR TRIAL.  (Partially raised below).

POINT V. THE CUMULATIVE IMPACT OF THESE ERRORS DENIED [DEFENDANT] A FAIR TRIAL.  (Not raised below).

POINT VI. [DEFENDANT]'S [FORTY]-YEAR SENTENCE, SUBJECT TO [NERA], WAS THE RESULT OF IMPERMISSIBLE DOUBLE COUNTING, AND THE COURT IMPOSED AN ILLEGAL FINE.

II.

"Evidentiary rulings made by the trial court are reviewed under an abuse-of-discretion standard."  State v. Scharf, 225 N.J. 547, 572 (2016).  However, when a defendant does not object to an evidentiary decision at trial, the issue is

---

[2]  257 N.J. 260 (2024).

A-0973-23

reviewed for plain error under Rule 2:10-2. State v. Watson, 254 N.J. 558, 590 (2023). Under the plain error standard, we will affirm unless the "error possess[es] a clear capacity to bring about an unjust result and . . . substantially prejudice[s] the defendant's fundamental right to have the jury fairly evaluate the merits of [their] defense." State v. Irving, 114 N.J. 427, 444 (1989) (quoting State v. Thornton, 38 N.J. 380, 396 (1962)).

A.

In Point I of his brief, defendant argues B.P.'s testimony about K.O.'s 2021 disclosure of the alleged abuse was improperly admitted under the fresh complaint doctrine hearsay exception and deprived him of due process. The disclosure to B.P. was not a fresh complaint because it was practically contemporaneous with K.O.'s report to police. This did not meet the purpose of the fresh complaint doctrine, which is to rebut or negate an inference a victim was not abused because they did not timely report the abuse to authorities. The State offered neither a rational explanation for the delayed disclosure nor expert testimony to explain why K.O. disclosed the abuse when she did.

Defendant alleges it was prejudicial for the court to instruct the jury that K.O.'s disclosure to B.P. could be used to negate any inference about her failure to report the sexual abuse sooner, and therefore her later assertion need not be

13

believed. The proper instruction would have been to tell the jury it may conclude K.O.'s testimony is untruthful based only on her silence or delayed disclosure, and consider her silence and explanation for this purpose, when deciding how much weight to afford to K.O.'s testimony.

Defendant contends the admission of B.P.'s hearsay testimony improperly bolstered K.O.'s testimony and undermined his claims of innocence, especially because the State's case rested on witness credibility. Indeed, there was no forensic evidence, eyewitnesses, or admissions by defendant. There was also an alternative explanation, namely, an ongoing custody dispute between B.P. and K.O.'s mother.

Defendant also asserts the disclosure six years after the abuse occurred was not made within a reasonable time. Detective Crawford's testimony about K.O.'s revelations also did not constitute fresh complaint evidence.

The fresh complaint doctrine allows "evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." State v. R.K., 220 N.J. 444, 455 (2015). "[T]o qualify as fresh-complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, to a person the victim would

ordinarily turn to for support."  Ibid.  "[S]tatements that are procured by pointed, inquisitive, coercive interrogation," fail to satisfy the spontaneity and voluntary requirement.  State v. Hill, 121 N.J. 150, 167 (1990).  "The line, however, between non-coercive questioning and coercive questioning depends on the circumstances of the interrogation."  Ibid.

The record shows K.O.'s disclosure to B.P. was six years after the abuse occurred, lacked spontaneity, and arguably was not voluntary.  Indeed, by K.O.'s own account, she "didn't want to tell" B.P. but she did not have "the choice to tell" since the fact she was abused had "c[o]me out already" after B.P. overheard K.O.'s conversation with her uncle.  K.O. only admitted defendant sexually abused her after B.P. confronted her.

However, we decline to conclude there was reversible error because "a party cannot strategically withhold its objection to risky or unsavory evidence at trial only to raise the issue on appeal when the tactic does not pan out."  State v. Santamaria, 236 N.J. 390, 409 (2019).  "Plain error has intentionally been created as a high bar for parties to meet in order to encourage litigants to raise any objections to evidence at the trial level where the court can best 'forestall or correct a potential error,' in a timely manner."  Ibid. (quoting State v. Bueso, 225 N.J. 193, 203 (2016)).

Defendant did not object to B.P.'s testimony at trial, nor did he object to the fresh complaint evidence jury instructions. This is because the gravamen of the defense was to suggest K.O. was lying because of her mother's custody dispute with B.P. and an emphasis on the delayed disclosure supported the defense's theory.

Detective Crawford's testimony also was not fresh complaint evidence. Defendant focuses on the following exchange during the detective's direct examination: "Q. Okay. And do you recall what [K.O.] told you? A. Yes. She described some time -- I believe she said at the time -- the years 2012 to 2014 she described instances of sexual assault where the defendant . . . had sexually assaulted her." However, again, defendant did not object to this admission and the detective's testimony, although hearsay, did not offer details, and therefore was not prejudicial error.

## B.

In Point III, defendant contends the trial court erred in admitting portions of his videotaped interrogation with detectives in which Detective Pahopin repeated K.O.'s accusations and vouched for her credibility by stating they were too detailed to be false. He points us to the following passage:

> DET. PAHOPIN: All right. . . . But, you know, she did
> say . . . that inappropriate things did happen in that car

16

that you would actually digitally penetrate her, stick your fingers inside of her vagina, make her suck on your thumb. That was pretty detailed for a young girl to say and we wanted to bring you in here and see what you had to say about that.

Defendant asserts this statement was inadmissible lay opinion and hearsay, and the failure to redact the detective's prejudicial comments or instruct the jury on how to assess them, risked the jury according significance to the detective's opinion about central facts of the case. The error was compounded because there was not overwhelming evidence of defendant's guilt.

During the following colloquy, the jurors also heard the detective suggest K.O. had no motive to lie about the abuse:

> [DEFENDANT]: . . . [I]t's really upsetting. Like I tried so hard -- you want to distance yourself, you grow as a person. You get to a certain point, and then it's like why these people trying to pull you back in with some bullshit that I don't have nothing to do with. Like I don't understand.
>
> DET. PAHOPIN: Well, . . . let me ask you a question. Why would [K.O.] come in . . . and lie and say that . . . something happened if it didn't?

The jury also heard the detective describe K.O.'s statement as "super detailed." And contrary to defendant's assertion that K.O. infrequently visited his apartment, the detective asserted it was "clear that she had been in there and probably multiple times."

17

A-0973-23

Defendant contends Detective Pahopin did not testify at trial, yet the jury heard him improperly opine about K.O.'s credibility and defendant's guilt. He claims the inability to cross-examine the detective violated his right to confrontation. Moreover, the admission of Detective Pahopin's remarks was not harmless because the State echoed the detective's testimony during summations when it argued the details K.O. provided made her more credible.

In State v. Cotto, the defense relied on an interrogation recording to emphasize its theory investigators had decided the case early and did not look into other possible leads. 471 N.J. Super. 489, 538 (App. Div. 2022). The defense used the recording to "highlight[] that the detectives employed an aggressive interrogation technique." Ibid. On appeal, the defendant claimed the portions of his interrogation containing statements made by the investigators about the case prejudiced the outcome and should not have been admitted. Id. at 505. We held the "counsel's decision to seek redaction of some portions of the interrogation recording but not others strongly suggests that, in the environment of the trial, the unredacted portions were not prejudicial." Id. at 538.

As in Cotto, defendant had the opportunity to redact portions of the interview. The video segment played at trial tracked the parties' agreed-upon

redactions, and defendant did not object. The defense used the interview recording to bolster the claim K.O. was motivated to lie because the jury heard defendant claim the allegations arose out of the custody dispute between B.P. and K.O.'s mother. For these reasons, we decline to conclude it was reversible error to admit the now-objected-to segments of the video interrogation.

C.

In Point IV, defendant contends the State's introduction of the iPhone photos of him and his former wife was prejudicial because it painted him as a "sexual deviant" and bore no relation to the charges against him. He points us to when the State recalled Detective Crawford to the stand and elicited the following testimony:

> Q. Okay. And did you . . . when you looked through that phone, find any photos of [defendant] within [t]he vault?
>
> A. Yes, I did.
>
> Q. Okay. Were those selfies of him?
>
> A. Yes.
>
> Q. And were there also photos of him without his clothes on?
>
> A. Yes.
>
> Q. Okay. Can you describe some of those photos?

19

A-0973-23

A. So, there were selfie style photos that pictured his whole body unclothed. I believe there were some mirror photos as well.

Q. Were . . . there also photos of just male genitalia that were in the series with those photographs?

A. Yes, there was.

The State also cross-examined defendant about his nude photos and the photos of him with his then-wife:

Q. Okay. And the iPhone[,] . . . you had [a] photo vault on it; right?

A. I did.

Q. And [the] photo vault is a password protected folder access; right?

A. It is.

Q. And in that folder[,] there's a folder for you; right?

A. There was.

Q. And your pictures of yourself and your genitalia were in there; right?

A. Correct.

Q. And there's also [a] photo vault folder for [your wife]?

A. Yes. My wife.

20

A-0973-23

Q.  Okay.  And on your phone[,] you had intimate photos of you and [your wife] engaged in sex acts; right?

A.  Correct.

After the defense objected on relevance grounds, the State responded the testimony was relevant to prove defendant kept the photo of K.O. for sexual reasons because it was in the same application as the nude photos of him and his wife, but in a separate folder.

Defendant asserts the relevance of this evidence was outweighed by its prejudicial nature.  The evidence created a risk the jury would convict him because the State painted him as a sexual deviant.  He claims this was improper prior bad acts evidence under State v. Cofield, 127 N.J. 328, 336 (1992).  Indeed, the photos of defendant and his wife were not relevant because they depicted an intimate relationship between consenting adults, and there was no indication the photos were taken within a reasonable time of the alleged abuse.  The photos were overwhelmingly prejudicial and had little probative value.

Even if the photos were admissible, defendant asserts reversal is warranted because the trial judge did not give the jury limiting instructions regarding how to consider them.  The jury should have been instructed it could consider this evidence only for the purposes of showing intent or absence of

A-0973-23

mistake related to his possession of the photo of K.O. vis-à-vis the child pornography charge. This evidence was prejudicial considering the dearth of evidence of defendant's guilt and the lack of a limiting instruction, and thus deprived defendant of due process.

"The mere possibility that evidence could be prejudicial does not justify its exclusion." State v. Morton, 155 N.J. 383, 453-54 (1998). Evidence is inadmissible when its relevance "is substantially outweighed by the risk of . . . [u]ndue prejudice, confusion of issues, or misleading the jury." N.J.R.E. 403(a).

"[E]vidence is intrinsic if it directly proves the charged offense." State v. Rose, 206 N.J. 141, 180 (2011) (quoting United States v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010)) (internal quotation marks omitted). It follows that uncharged misconduct, which directly proves the charged offense, is not other-crimes evidence and is therefore admissible. Ibid.

Evidence that is not intrinsic must satisfy N.J.R.E. 404(b), which allows for admission of "evidence of other crimes, wrongs, or acts" to prove intent, knowledge, "or absence of mistake or accident when such matters are relevant to a material issue in dispute." Other crimes evidence is admitted pursuant to a four-pronged analysis in Cofield, which we need not repeat here. 127 N.J. at 338.

22

At the outset, we note the photos defendant complains about were never introduced at trial. Regardless, the existence of sexually explicit photos of defendant and his former paramours within the same locked application as a photo revealing K.O.'s breasts was probative of defendant's sexual intentions towards K.O. Therefore, the relevance of the testimony regarding the photos stored on defendant's phone outweighed the prejudice of the jury knowing he had a sex life. In this regard, the photos were clearly not prior bad act evidence because the jury would have little difficulty understanding there was nothing illegal about an adult having nude photos of himself and other consenting adults on his phone.

The partially nude photograph of K.O. from the "!!!!!" folder constituted illegal child pornography, an offense charged in count five. The photos of defendant's genitalia were relevant to the child endangerment offense charged in count three because K.O. alleged defendant showed her these photos.

The fact that photos of defendant's genitals and his sexual partners were stored in the same location as photos of K.O. was also relevant because it demonstrated defendant's intent toward K.O., and dispelled his claim the photo appeared on his phone through inadvertence and that he considered K.O. a sister.

23

Sexual intent was a necessary element of the charged offenses. We discern no reversible error in the admission of this evidence.

III.

In Point II, defendant challenges his conviction on third-degree possession of an item depicting the sexual exploitation or abuse of a child under N.J.S.A. 2C:24-4(b)(5)(b)(iii) as unconstitutionally broad. Defendant argues the statute suffers from the same infirmities as the statute struck down in Higginbotham.

Defendant claims the statute does not include a requirement for the child nudity to be lewd or lascivious, and in defining criminality, only asks whether "any person" may be sexually stimulated or gratified by the depiction. He believes the statute is arguably broader than the one in Higginbotham, which contained exceptions for "serious literary, artistic, political, or scientific value." 257 N.J. at 267 (discussing subsection (c) of N.J.S.A. 2C:24-4(b)(1)). It has no language limiting its reach to prurient or patently offensive conduct and instead criminalizes a significant portion of speech, which is not obscene or pornographic.

Defendant asserts that for a child pornography statute to be constitutionally sound, it must be tailored to restrict the depiction of sexual conduct by children, and acts constituting sexual conduct must be limited and

24

described by the law. This is because nude depictions of children, without more, are constitutionally protected. Defendant notes a plain reading of the statute would categorize any depiction of a child's genitals as child pornography, even if the image was created for legitimate medical purposes. Instead of facially invalidating the statute altogether, defendant alternatively argues we should construe "nudity" to require a lewd or lascivious exhibition.

Defendant also claims the statute is unconstitutionally vague because someone of ordinary intelligence would not understand what it prohibits. The statute does not provide an ascertainable standard to determine when an innocent depiction becomes child pornography.

N.J.S.A. 2C:24-4(b)(5)(b)(iii) states: "A person commits a crime of the third degree if the person knowingly possesses, knowingly views, or knowingly has under the person's control, through any means, including the Internet, less than 1,000 items depicting the sexual exploitation or abuse of a child." N.J.S.A. 2C:24-4(b)(1)(i) defines a "prohibited sexual act" as including "[n]udity, if depicted for the purpose of sexual stimulation or gratification of any person who may view such depiction."

We presume statutes are constitutionally valid. State v. Buckner, 223 N.J. 1, 14 (2015). A statute will be declared unconstitutional if "its repugnancy to

the Constitution is clear beyond a reasonable doubt." State v. Smith, 251 N.J. 244, 263 (2022) (quoting State v. Lenihan, 219 N.J. 251, 266 (2014)). "The party challenging the validity of the statute bears this 'heavy burden' of proof." State v. Balbosa, 481 N.J. Super. 497, 525 (App. Div. 2025) (quoting Buckner, 223 N.J. at 14). "Where a statute 'criminalizes expressive activity,' we construe it 'narrowly to avoid any conflict with the constitutional right to free speech.'" State v. B.A., 458 N.J. Super. 391, 407 (App. Div. 2019) (quoting State v. Burkert, 231 N.J. 257, 277 (2017)).

"A criminal statute challenged as vague is subject to 'sharper scrutiny and given more exacting and critical assessment under the vagueness doctrine than civil enactments.'" Balbosa, 481 N.J. Super. at 526 (quoting State v. Cameron, 100 N.J. 586, 592 (1985)). "A statute is facially or perfectly vague if 'there is no conduct that it proscribes with sufficient certainty.'" State v. Saunders, 302 N.J. Super. 509, 521 (App. Div. 1997) (quoting Cameron, 100 N.J. at 593).

"A law is facially vague if it is vague in all applications." Lenihan, 219 N.J. at 267. A statute "challenged as vague as applied must lack sufficient clarity respecting the conduct against which it is sought to be enforced." Ibid. (quoting Visiting Homemaker Serv. of Hudson Cnty. v. Bd. of Chosen Freeholders of Cnty. of Hudson, 380 N.J. Super. 596, 612 (App. Div. 2005)).

26

Overbroad statutes "suffer from a different flaw. They invite 'excessive governmental intrusion into protected areas' by 'extend[ing] too far.'" State v. Carter, 247 N.J. 488, 518 (2021) (alteration in original) (quoting Karins v. Atl. City, 152 N.J. 532, 544 (1998)). "A law may be held facially overbroad in violation of the First Amendment '[i]f the challenger demonstrates that the statute "prohibits a substantial amount of protected speech" relative to its "plainly legitimate sweep."'" Balbosa, 481 N.J. Super. at 526 (alteration in original) (quoting Higginbotham, 257 N.J. at 277-78).

> As our Supreme Court has explained, "[t]he two claims differ analytically":

> The vagueness concept . . . rests on principles of procedural due process; it demands that a law be sufficiently clear and precise so that people are given fair notice and adequate warning of the law's reach. The overbreadth concept, on the other hand, rests on principles of substantive due process; the question is not whether the law's meaning is sufficiently clear, but whether the reach of the law extends too far. The evil of an overbroad law is that in proscribing constitutionally protected activity, it may reach farther than is permitted or necessary to fulfill the state's interests.

> [Id. at 526-27 (quoting Carter, 247 N.J. at 518).]

27

Pursuant to these principles, we reject defendant's argument the statutory provision here has the same constitutional defect as the one in Higginbotham. The statute in Higginbotham criminalized obscenity whereas the statute here criminalizes child pornography, which is not constitutionally protected. 257 N.J. at 274-75. Courts have consistently upheld laws defining child pornography as images of sexual conduct or acts, including "lewd" or "lascivious" displays of a child's "genitals[] or pubic area," or "uncovered . . . buttocks or breasts." Id. at 275 n.4, 282. The statute here bans depictions of child nudity intended for sexual gratification of the viewer, which is clearly unprotected child pornography.

The statute in Higginbotham is distinguishable because its language was not limited to material that legally constitutes child pornography as it did not reference either a child's intimate parts or a purposeful sexual intent. The Court explained the unconstitutional characteristics of the statute in Higginbotham as follows: "Where the criminalization depends only on whether 'any person who may view the depiction' can use it 'for the purpose of sexual stimulation or gratification,' and where the only limit is that the depiction lacks 'serious literary, artistic, political, or scientific value,' large swaths of protected material are conceivably ensnared." 257 N.J. at 283 (quoting N.J.S.A. 2C:24-4(b)(1)).

A-0973-23

Examples of protected materials included "photos of children on the beach, at sporting events, or performing in a dance recital or beauty pageant." Ibid. The statute in Higginbotham was invalid because "[o]n its face, [it] criminalize[d] only materials that do not constitute child pornography . . . and that do not lasciviously or lewdly depict a child's genitals, pubic area, buttocks, or breast." Ibid.

Unlike the Higginbotham statute, the one here specifically requires nudity, namely unclothed genitals, buttocks, or breasts. Importantly, the statute here also contains limiting language the Higginbotham statute lacked, which requires the depiction of nudity be purposely sexual, meaning it does not apply to nudity that is not lascivious or lewd. The comparisons defendant draws to Higginbotham are inapt.

In Balbosa, we contended with the statutory definition "portray a child in a sexually suggestive manner" under N.J.S.A. 2C:24-4(b)(1). 481 N.J. Super. at 530. Subsections (a) and (b) of the statute criminalize depictions of a "child's less than completely and opaquely covered intimate parts" or "any form of contact with a child's intimate parts" were composed in a manner that "concentrate[s] prurient interest on the child." N.J.S.A. 2C:24-4(b)(1). We upheld both sections of the statute, reasoning as follows:

A-0973-23

Subsections (a) and (b) are initially limited by the requirement that images must depict a child's "intimate parts" . . . . The statute's scope is further narrowed by the requirement that the images must depict certain conduct in relation to a child's intimate parts . . . . And the statute's reach is limited even further by the requirement, common to both subsections (a) and (b), that [the image] " . . . emits sensuality with sufficient impact to concentrate prurient interest on the child."

The combination of these three requirements prevents subsections (a) and (b) from "'prohibit[ing] a substantial amount of protected speech' relative to its 'plainly legitimate sweep.'" For example, the Higginbotham Court agreed with our court that "subsection (c) could criminalize photos of children on the beach, at sporting events, or performing in a dance recital or beauty pageant." However, none of these examples would fall within the reach of subsections (a) or (b) because they were not created with the intent of "concentrat[ing] prurient interest on the child."

[Balbosa, 481 N.J. Super. at 532-33 (second and third alterations in original) (citations omitted).]

Here, there is no concern the statute would criminalize photos of children at the beach, or engaged in sports, dance, or beauty pageants because the statute uses the word "nudity" and combines it with purposeful conduct. In this case, the conduct was defendant's storage of K.O.'s nude picture in the same application as other sexually explicit photos. For these reasons, we reject defendant's constitutional challenges to N.J.S.A. 2C:24-4(b)(5)(b)(iii).

IV.

In Point V, defendant argues while the errors addressed in Points I through IV independently warrant reversal, their cumulative effect requires reversal. "An error is harmless unless, in light of the record as a whole, there is a 'possibility that it led to an unjust verdict' – that is, a possibility 'sufficient to raise a reasonable doubt' that 'the error led the jury to a result it otherwise might not have reached.'" State v. J.L.G., 234 N.J. 265, 306 (2018) (quoting State v. Macon, 57 N.J. 325, 335-36 (1971)). Error that may be harmless in itself, when combined with another error may have a "cumulative effect [which] can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008).

We are unconvinced there was prejudicial error on either an individual or cumulative basis. "[A] defendant is entitled to a fair trial, [but they are] not entitled to a perfect trial, 'for there are no perfect trials.'" United States v. Payne, 944 F.2d 1458, 1477 (9th Cir. 1991) (quoting Brown v. United States, 411 U.S. 223, 231-32 (1973)). Defendant received a fair trial.

V.

Defendant contends the sentencing was erroneous. In finding aggravating factor two, the judge impermissibly double-counted K.O.'s youthfulness, which

A-0973-23

was also an element of the offenses. Defendant asserts the judge also engaged in double-counting by basing his finding of aggravating factor nine on the Legislature's intention to increase penalties for aggravated sexual assault pursuant to the Jessica Lunsford Act, N.J.S.A. 2C:14-2. The judge acknowledged the Act already enhances the penalty set by the Legislature for this crime. Defendant argues, therefore, he should not have considered the Act for purposes of finding aggravating factor nine.

Defendant asserts, if these aggravating factors are set aside, the remaining aggravating factor, factor three, does not justify the lengthy sentence imposed. Moreover, the judge did not identify the weight given to each factor to help understand how he assessed them. Defendant urges us to remand for resentencing because his forty-year sentence equates to a life-sentence as he is presently thirty-nine-years-old.

Defendant alleges he was also assessed an illegal penalty for the Sex Offender Supervision Fund, N.J.S.A. 30:4-123.97, which specifies its thirty-dollar monthly penalty "shall not be assessed . . . if the person's income does not exceed 149 percent of the federal poverty level." Defendant had no income at sentencing, so the penalty portion of his sentence should be vacated.

Defendant notes the judgment of conviction improperly lists aggravating factor six, N.J.S.A. 2C:44-1(a)(6), which the judge did not find. Therefore, a remand is necessary to correct the judgment of conviction to delete this aggravating factor.

Our review of a sentence is guided by an abuse of discretion standard and is inherently deferential. State v. Jones, 232 N.J. 308, 318 (2018); State v. Trinidad, 241 N.J. 425, 453 (2020). We must "consider whether the trial court has made findings of fact that are grounded in competent, reasonably credible evidence and whether 'the factfinder [has] appl[ied] correct legal principles in exercising its discretion.'" State v. Blackmon, 202 N.J. 283, 297 (2010) (alterations in original) (quoting State v. Roth, 95 N.J. 334, 363 (1984)). A sentence must be affirmed unless a trial court violated the sentencing guidelines, found aggravating or mitigating factors not based on competent and credible evidence in the record, or applied the guidelines in such a manner as to "make[] the sentence clearly unreasonable so as to shock the judicial conscience." State v. Miller, 237 N.J. 15, 28 (2019) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)).

In applying aggravating factor two, it is proper to consider "[t]he extreme youth of the victim" even where "the conviction itself require[s] that [the]

33

defendant have 'sexual contact with a victim who [was] less than 13 years old.'" Miller, 237 N.J. at 30-31 (all but second alteration in original) (quoting State v. Taylor, 226 N.J. Super. 441, 453-54 (App. Div. 1988) (finding the victim's "extreme youth . . . was a proper aggravating factor to have been considered by the court")). It is also appropriate to consider the relationship between the defendant and the victim. State v. Yarbough, 100 N.J. 627, 646 (1985) ("[I]t is . . . appropriate to consider the relationship between the parties as an aggravating factor in determining whether to impose a maximum sentence for a first-degree crime."); see Taylor, 226 N.J. Super. at 453 (considering the fact the "victim was [the] defendant's four-year old niece").

The trial judge relied on K.O.'s "extreme youth" and the familial relationship between her and defendant in finding aggravating factor two. The judge found K.O. was "between six and eight years of age" at the time of the abuse, which is at least five years below the maximum age of thirteen proscribed by N.J.S.A. 2C:14-2(a)(1). Therefore, the court's finding K.O. "was particularly vulnerable due to her extreme youth," is supported by the record. In addition, he found K.O. was particularly vulnerable because defendant considered her as "a little sister." This finding is supported by the record as K.O. testified defendant's relationship with her was "like he was [her] brother," and defendant

repeatedly testified she is his "sister." Consequently, the judge's finding of aggravating factor two was in accordance with the law because he supported his finding with the fact defendant abused a very young relative.

Our Supreme Court has provided the following guidance as to aggravating factor nine:

> [D]eterrence incorporates two "interrelated but distinguishable concepts," the sentence's "general deterrent effect on the public [and] its personal deterrent effect on the defendant." In the absence of a finding of a need for specific deterrence, general deterrence "has relatively insignificant penal value." In weighing the applicability of aggravating factor nine, the sentencing court accordingly focuses on the need to deter the individual defendant "from violating the law." N.J.S.A. 2C:44-1(a)(9).
>
> [Fuentes, 217 N.J. at 79 (citations omitted) (quoting State v. Jarbath, 114 N.J. 394, 405 (1989)).]

The trial judge found defendant had a repetitious criminal history, which required that he be deterred, including: incarceration for his prior sexual offenses against two young girls; the fact he was on Megan's Law and PSL when he abused K.O.; and he committed the abuse following his participation in a rehabilitation program. The judge also reviewed defendant's Avenel report, which found defendant to be a repetitive, albeit not compulsive, offender. Although the judge did not say he was applying these facts to aggravating factor

nine, his factfinding preceded his application of aggravating factor nine and clearly supported him finding this aggravating factor.

Finally, even though defendant was employed prior to his conviction, the State does not oppose a remand of the imposition of the Sex Offender Supervision Fund penalty, N.J.S.A. 30:4-123.97, for reassessment. The State also agrees a remand is necessary to correct the judgment of conviction to remove aggravating factor six. We remand and direct the trial judge to correct the judgment of conviction to delete aggravating factor six and address the penalty issue only.

VI.

Affirmed in part and remanded in part for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

36

A-0973-23